UNITED STATES *v.* ALLTRANSPORT, INC. (No. 4903) [1]

[1] C. A. D. 653.

150

United States Court of Customs and Patent Appeals, April 30, 1957

*George Cochran Doub*, Assistant Attorney General, *Richard E. FitzGibbon*, Chief, Customs Section (*Murray Sklaroff* and *Richard H. Welsh*, trial attorneys, of counsel), for the United States.

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Edward N. Glad* of counsel) for appellee.

[Oral argument April 3, 1957, by Mr. Welsh and Mr. Schwartz]

Before JOHNSON, Chief Judge, and O'CONNELL, WORLEY, RICH, and JACKSON (retired), Associate Judges

RICH, Judge, delivered the opinion of the court:

This is an appeal by the Government from the judgment of the United States Customs Court (C. D. 1807), overruling the action of the Collector of Customs at the Port of New York and sustaining the importer's protests thereto.

The Customs Court accurately described the imports as follows:

The merchandise consists of what are known as absorbable gelatin sponges. They are sponges made of pure gelatin, not medicated in any way, and used in surgery to stop excessive capillary and venous bleeding by bringing about a firm, adherent blood clot. They also help the surgeon to maintain a clean field so that it is not necessary to continually remove blood from the area of the surgery. After the clot is formed, the sponges are left inside the patient and are absorbed by the system of the patient within a period of from 4 to 6 weeks, disappearing without any trace.

We add that they are imported in sterile packages ready for use.

The merchandise was classified by the collector under the provisions of paragraph 41 of the Tariff Act of 1930, as manufactures of gelatin, and duty was assessed thereon at the rate of 15 per centum ad valorem under that paragraph as modified by the General Agreement on Tariffs and Trade, T. D. 51802.

The importer protested the above classification and assessment, claiming the merchandise was properly classifiable as medicinal prep-

arations under the provisions of paragraph 5, Tariff Act of 1930, and assessable at the rate of 12½ per centum ad valorem under that paragraph as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T. D. 52739.

The statutes involved are as follows:

Paragraph 41 as modified by T. D. 51802:

| "Tariff Act of 1930, para-graph | Description of Products | Rate of Duty |
|---|---|---|
| 41 | Manufactures, wholly or in chief value of gelatin, glue or glue size_____ | 15% ad val." |

Paragraph 5, as modified by T. D. 52739:

| "Tariff Act of 1930, para-graph | Description of Products | Rate of Duty |
|---|---|---|
| 5 | All chemical elements, all chemical salts and compounds, all medicinal preparations and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for (except ajinomoto and other monosodium glutamate preparations, ammonium silicofluoride, Haarlem oil, and products chiefly used as assistants in preparing or finishing textiles)_____ | 12½% ad val." |

The record consists of the testimony of one witness, called by the importer, and one exhibit introduced into evidence by the importer which was indicative of the merchandise at bar.

The witness was the Vice-President of the Delmond Pharmaceutical Corporation, whose business was importing and distributing pharmaceutical products. He had been with the company for all of its two and a half years of existence.

The witness testified that the instant merchandise is sold by his firm under the trademark "Spun-Gel," and that the merchandise was called an "absorbable gelatin sponge." He further stated that it was required by the United States Food and Drug Administration that the product be labeled with the words "Caution, to be sold only upon presentation of prescription," or similar wording.

In addition to the above-quoted description by the lower court, the evidence shows that the sponges are non-antigenic, that is they do not produce antigens or foreign body reactions, and are non-pyrogenic, that is they do not produce fever. Aside from these negative characteristics, they have the positive property of *accelerating* the clotting of blood because of the fact, as will more fully appear hereinafter, that they are made of gelatin.

The importer, appellee herein, contends that the merchandise at bar is included within the definitions which have been laid down by the courts for "medicinal preparations" arising under the present and previous acts, and that inasmuch as the provision for medicinal preparations is a designation by use, under the doctrine of relative specificity it is a more specific provision than the provision for manufactures of gelatin, which is an unlimited general provision.

The Government contends, apparently on the basis of the admission that the sponges contain no added medication, that they have no "therapeutic" properties, and so cannot be considered to be "medicinal preparations," but rather are devices, pure and simple, used as "tools" by the surgeon as he might use cotton packs, or metal clamps; and further, that "manufactures of gelatin" is more specific than the use provision for "all medicinal preparations, * * * *not specially provided for."*

Obviously "Manufactures, wholly or in chief value of gelatin" is inclusive of the instant merchandise. Appellee conceded at the trial that the sponges "are manufactures of gelatin." The question next arises, are they "medicinal preparations"?

Both the parties cite to us the same authority as setting forth a proper definition of "medicinal," as they did below, namely *Dodge & Olcott* v. *United States*, 130 Fed. 624 (C. C., S. D., N. Y. 1891):

> * * * As to the precise meaning of the word "medicinal," for the purposes of this particular case I will assume—without undertaking to say what may or what may not be the conclusion which the court will arrive at when it becomes necessary, if it does hereafter, to determine the precise meaning of that, I will assume— that it confines the noun with which it is coupled to something which is of use, or believed by the prescriber or user fairly and honestly to be of use, in curing or alleviating, or palliating or preventing, some disease or affection of the human frame.

The predecessor of this court quoted the above with approval in *Smith & Son Mfg. Co.* v. *United States*, 15 Ct. Cust. Appls. 277.

In our attempt to discern the true nature of the imported merchandise, we have taken judicial notice of the standard medical and chemical reference works cited *infra*.

The American Illustrated Medical Dictionary, 22nd Edition, at page 604, states:

> *gelatin* * * * Gelatin has been used subcutaneously to arrest internal hemorrhage and *to cause coagulation* in sacculated aneurysms. * * * [Emphasis ours.]

The United States Dispensatory, 1950 Edition, at page 496, states:

In 1896 Dastre and Floresco called attention to the fact that the intravenous injection of gelatin solutions *greatly accelerated the coagulation of the blood* and used it in the treatment of internal hemorrhages. * * * [Emphasis ours.]

Hackh's Chemical Dictionary (3rd Ed.), includes the following under the definition of gelatin:

Gelatin is used as a nutrient; *medicinally as a hemostatic;* * * * [Emphasis ours.]

The same work defines "hemostatic" as:

An agent which when applied externally, checks the flow of blood; * * *.

The Encyclopaedia Britannica (1942 Ed.), under "gelatin," shows its uses in a chart which lists "in medicine—therapeutics—hemostatic agent," naming thereafter about ten specific human maladies to which such use is applicable, including hemophilia.

The Kirk-Othmer Encyclopedia of Chemical Technology (1951), Vol. 7, page 420 states:

Hemostatic agents are substances used for the purpose of stopping bleeding. *Their action is fundamentally of a chemical nature,* insofar as they either cause the blood to clot or materially aid the normal clotting mechanism of the blood. They are applied to the bleeding surface and by mechanical and chemical means aid the formation of blood clots at the end of severed blood vessels. [Emphasis ours.]

It therefore appears that gelatin *per se* has hemostatic properties and that hemostatic action may be mechanical or chemical or both.

The United States Dispensatory of 1950, at page 1955, speaking of articles similar to the instant merchandise, states:

ABSORBABLE GELATIN SPONGE

U. S. P.

"Absorbable Gelatin Sponge is a sterile, absorbable, water-insoluble gelatin-base sponge." U. S. P.

* * * * * * *

* * * The hemostatic action of the sponge depends in part on its action as a tampon *and in part on the liberation of thromboplastin from damaged platelets* which become traumatized by contact with the walls of the interstices of the foam structure. Though the gelatin sponge is water-insoluble it will absorb about 50 times its weight of water or about 45 times its weight of blood. Following application to bleeding tissue it undergoes enzymic digestion as healing progresses and in two to four weeks the gelatin is usually completely "absorbed." * * *. [Emphasis added.]

It therefore seems clear that the instant merchandise has a chemical interaction on or with the blood which, with respect to the human body, is therapeutic or medicinal in nature and it is used "in curing or alleviating, or palliating or preventing some disease or affection of the human frame," within the definition of "medicinal" in the *Dodge & Olcott* case, *supra*.

We are clearly of the opinion that the Government contention that

gelatin sponges are mere devices, devoid of therapeutic properties, is contrary to fact. The Customs Court stated in its opinion that:

It is clear that the manner in which the sponges accomplish their function of aiding the blood clotting is entirely physical, so far as the sponges themselves are concerned.

This too, if we correctly understand it, seems to us to be contrary to the evidence and the clear teachings of the above cited references which show that chemical action or reaction is involved in the hemostatic action of gelatin, whatever its physical form. We, therefore, find the Government's reliance on this and like statements in the opinion below to be less than persuasive.

Therefore, we hold that the instant merchandise is within the "medicinal preparations" provision of paragraph 5 of the Tariff Act of 1930, as modified, as did the court below on somewhat different grounds.

Having established that "absorbable gelatin sponges" is embraced by the language of paragraph 41, as well as that of paragraph 5, the question which is presented in this case resolves itself to an issue of relative specificity. It has been repeatedly held by this court that, subject to a clearly shown contrary legislative intent, a "not specially provided for" clause in a use provision excludes therefrom articles enumerated elsewhere by an *eo nomine* designation. *Germania Importing Co.* v. *United States*, 6 Ct. Cust. Appls. 467, T. D. 35988. This principle is subject, however, to the qualification that the competing provision must be more than an unlimited general description of the merchandise. It must aptly and specifically name or describe the goods, i. e., the goods must actually be specially provided for. See, for example, *United States* v. *Snow's United States Sample Express Co.*, 6 Ct. Cust. Appls. 120, T. D. 35388, wherein our predecessor court held that shirt bosoms of tucked cotton material were more specifically described by the terminology "wearing apparel composed of cotton or of cotton in chief value made up or manufactured in part," than by the language "articles made up in part of tuckings of whatever yarns, threads, or filaments composed" since the former more closely describes and identifies the goods.

"Medicinal preparations" in paragraph 5 "is equivalent to an enumeration of every medicinal preparation not otherwise specially provided for by name." *United States* v. *Hillier's Son Co.*, 14 Ct. Cust. Appls. 216, T. D. 41706; and, as stated in the *United States* v. *Snow's United States Sample Express Co.* case, the clause "not specially provided for" lessens the relative specificity of a provision only where competing provisions are otherwise equally applicable to the involved merchandise.

Paragraph 41 admittedly describes the instant gelatin sponges, but the language used is "manufactures * * * of gelatin" and this court

and its predecessor have held that "manufactures of" is a term of general description. *Bough* v. *United States*, 14 Ct. Cust. Appls. 60, T. D. 41575; *United States* v. *Garlock Packing Co.*, 32 C. C. P. A. (Customs) 79, C. A. D. 289.

We are, therefore, of the opinion that "manufactures * * * of gelatin" is less specific than "medicinal preparations" not specially provided for and that the instant merchandise is more specifically described by the latter language and hence classifiable thereunder.

The lower court is therefore *affirmed*.

JACKSON, J., Retired, recalled to participate herein in place of COLE, J., absent because of illness.

---

WORLEY, Judge, dissenting:

There can be no doubt that the merchandise is a manufacture of gelatin within the meaning of paragraph 41. But there is grave doubt in my mind that the evidence of record supports a holding that the gelatin sponges have anything more than a physical action in aiding the clotting of blood. The fact that the majority apparently finds it necessary to refer to extrinsic texts in support of its holding strengthens that conclusion. I would reverse on the ground that the presumption of correctness of the collector's classification has not been satisfactorily overcome.