**RICHARDS MEDICAL COMPANY,**
Plaintiff–Appellee,

v.

The UNITED STATES,
Defendant–Appellant.

No. 89–1693.

United States Court of Appeals,
Federal Circuit.

Aug. 3, 1990.

Lester L. Hewitt and Paul E. Krieger (argued), Pravel, Gambrell, Hewitt, Kimball & Krieger, Houston, Tex., for plaintiff-appellee. With them on the brief, was Eugene R. Montalvo.

Joseph I. Liebman (argued), Atty. in Charge, Intern. Trade Field Office, New York City, for defendant-appellant. With him on the brief, were Stuart M. Gerson, Asst. Atty. Gen. and David M. Cohen, Director.

Before RICH, Circuit Judge, and BALDWIN and WILL[*], Senior Circuit Judges.

RICH, Circuit Judge.

The United States Customs Service (Customs) appeals from the June 27, 1989 Judgment of the United States Court of International Trade (CIT), Court No. 84–10–01337, ordering Customs to liquidate certain medical instruments imported by Richards Medical Company (Richards) in accordance with item 960.15 of the Tariff Schedules of the United States (TSUS). The CIT's opinion is reported at *Richards Medical Co. v. United States,* 720 F.Supp. 998 (CIT 1989). We affirm.

## BACKGROUND

In 1982, Congress passed the Educational, Scientific, and Cultural Materials Importation Act of 1982[1] (the Act), providing for temporary duty-free entry of various merchandise, including "[a]rticles specially designed or adapted for the use or benefit of the blind or other physically or mentally handicapped persons." This particular exemption from duty was subsequently inserted as items 960.10, 960.12 and 960.15 of the TSUS. Also, as provided by the Act, the following was inserted as Headnote 2 of Part 4 of TSUS Schedule 9:

2. For the purpose of items 960.10, 960.12, and 960.15—

(a) The term *"physically or mentally handicapped persons"* includes any person suffering from a permanent or chronic physical or mental impairment which substantially limits one or more major life activities, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

(b) These items do not cover—

(i) articles for acute or transient disability;

(ii) spectacles, dentures, and cosmetic articles for individuals not substantially disabled;

(iii) therapeutic and diagnostic articles; and

(iv) medicines or drugs.

Richards imported three different kinds of hip prosthesis systems (the Autophor, Spectron, and Xenophor systems), as well as medical instruments specifically designed and sold for use with the different

---

[*] Senior Judge Hubert L. Will of the Northern District of Illinois, sitting by designation.

1. Pub.L. 97–446, 96 Stat. 2346 (1982).

kinds of systems. Customs classified the hip prosthesis systems under item 960.15, TSUS,[2] thus entitling them to duty-free treatment, but classified the instruments under item 709.27, TSUS.[3] Customs denied the subsequent protests by Richards seeking classification of the instruments under item 960.15, on the grounds that they were "therapeutic," and thus ineligible for classification under item 960.15 by headnote 2(b)(iii).[4]

Richards appealed the classification of the instruments to the CIT. Upon review of the statutory language and the limited legislative history, the CIT concluded that the term "therapeutic" in the Act distinguishes articles which are used to heal the condition causing a handicap (therapeutic) from articles which are merely designed to compensate for, or adapt to, the handicapped condition (not therapeutic). *Richards Medical*, 720 F.Supp. at 1000. The CIT further found that a hip prosthesis does not heal handicapped persons nor cure the disease which caused the handicap, and thus is not therapeutic within the meaning of the Act. Since, concluded the CIT, the medical instruments have no other use than with the prosthesis systems and are used for the benefit of handicapped persons, classification of the instruments under item 960.15 was warranted. Customs appealed.

## OPINION

■ What appears at first to be a single issue—are instruments used to implant hip prostheses therapeutic—is actually two issues: (1) what is the meaning of therapeutic within the context of the Act; and (2) are instruments used to implant hip prostheses within that meaning. The first issue is a question of law subject to review de novo, and the second issue is a question of fact subject to the clearly erroneous

standard. *Hasbro Industries, Inc. v. United States*, 879 F.2d 838, 840 (Fed.Cir.1989).

■ The first issue, that of the meaning of "therapeutic," is essentially an issue of statutory construction. As with all questions of statutory construction, we start first with the plain meaning of the statute, and then go to other extrinsic aids such as legislative history if necessary. *Johns–Manville Corp. v. United States*, 855 F.2d 1556, 1559 (Fed.Cir.1988).

Customs' primary argument with respect to the plain or common meaning of the word "therapeutic" is that it is not limited to treatments which are intended to be *curative*, but also encompasses treatments which are *alleviative* or *palliative*. In support of this argument, Customs relies not only on numerous dictionary and encyclopedia definitions, but also on prior case law involving the meaning of "therapeutic" in other statutes. For example, *J.E. Bernard & Co. v. United States*, 262 F.Supp. 434, 58 Cust.Ct. 23, 28, C.D. 2872 (1967) indicates that "therapeutic qualities embrace the alleviative or palliative, as well as the curative or healing qualities."

However, the only conclusion we can reach after reviewing the various definitions from different sources which the parties have provided for us is that the word "therapeutic" has many different meanings and is subject to both broad and narrow interpretations. The question is, which definition best invokes the intent of Congress?

The legislative history is not very helpful on this point. However, one example of an item which is not "therapeutic" is given, and this example definitely cuts against construing this term broadly to include alleviative or palliative treatments, i.e., treatments which help the handicapped person live with his or her handicapped condition.

---

**2.** TSUS 960.15 reads: "Articles specially designed or adapted for the use or benefit of the blind or other physically or mentally handicapped persons (however provided for in schedules 1 to 7) ... Other."

**3.** Item 709.27, TSUS reads:
Medical, dental, surgical and veterinary instruments and apparatus (including elec-

tromedical apparatus and ophthalmic instruments), and parts thereof ... Other ... Other.

**4.** Customs now maintains that the hip prosthesis systems themselves should also not have been classified under item 960.15 for the same reason, but that it cannot now change the classification of that merchandise which has been liquidated without protest.

In particular, the Senate Report accompanying the Act indicates that an automobile fitted with special seats for use by the handicapped or with special attachments to permit a handicapped person to operate the automobile are indicated as being within the scope of the Act. S.Rep. No. 564, 97th Cong., 2d Sess. 20, *reprinted in* 1982 U.S. Code Cong. & Admin. News 4077, 4097. However, such a specially-equipped automobile is certainly "alleviative" in the sense that it helps the handicapped person to live with the handicap by helping him or her to ride in or drive a car. Thus, to interpret the word "therapeutic" broadly to include "alleviative" would be inconsistent with the one specific example in the legislative history.

In fact, our impression after reading the legislative history is that the CIT drew a very proper distinction in this case. Congress intended to encourage the importation of that merchandise which is designed to compensate for, or help adapt to, the handicapped condition. At the same time, Congress did not want to allow duty-free importation of merchandise which is used to heal or cure the condition causing the handicap.

■ Which brings us the second, factual issue: does a hip prosthesis (and consequently the instruments used to implant it) heal or cure a person with a handicap or does it merely allow the handicapped person to better compensate for the handicap? The answer to this question lies heavily in how one defines the underlying condition. Customs argues that a person in need of hip replacement suffers from an inoperative hip. Thus, they conclude, it is "difficult to imagine a better 'cure' for a diseased hip than the insertion of brand new components to replace the area affected by disease." Appellant's Brief at 15. Richards, on the other hand, points out that a person who needs a hip prosthesis because he or she suffers from, for example, severe arthritis still has arthritis after the operation. The prosthesis merely allows the person to better compensate for the arthritis.

In concluding that hip prostheses merely help handicapped persons adapt to their condition, the CIT relied heavily on the parties' stipulation before trial that:

> The Prosthetic Systems are implanted in physically handicapped persons in order to improve their ability to walk or even to allow them to walk when they were severely crippled prior to implantation . . .

The CIT noted that the implantation of prosthetic hips is performed *because of* the incurable nature of the underlying disease, and that the replacement of the hip joint is a "compensatory remedy of a disability and not a therapy." *Richards Medical,* 720 F.Supp. at 1001.

We do not find these factual conclusions to be clearly erroneous. Therefore, we *affirm* the CIT's conclusion that the instruments used to implant the prostheses are not therapeutic and thus are classifiable under item 960.15, TSUS.

AFFIRMED.