**TRAVENOL LABORATORIES, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 89–08–00469.**

United States Court of International Trade.

Feb. 3, 1993.

Katten Muchin & Zavis, Mark S. Zolno, Lynn S. Baker and Jeremy R. Page, Chicago, IL, for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., Joseph I. Liebman, Atty. in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Mark S. Sochaczewsky, Office of Asst. Chief Counsel, U.S. Customs Service, Washington, DC, Chi S. Choy, New York City, of counsel, for defendant.

*Opinion*

AQUILINO, Judge:.

In this action, which has been designated a test case pursuant to CIT Rule 84, the plaintiff recites *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), that it is "emphatically the province and duty of the judicial department to say what the law is" but also takes the position that that has already occurred in a matter like this.

I

The origin of this case can be found in subtitle B of Title I of Public Law No. 97–446, 96 Stat. 2329, 2346, known as the Educational, Scientific, and Cultural Materials Importation Act of 1982 and which had as its purpose "enabl[ing] the United States to give effect to the Nairobi Protocol to the Florence Agreement on the Importation of Educational, Scientific, and Cultural Materials ... with a view to contributing to the cause of peace through freer exchange of ideas and knowledge across national boundaries." The referenced Agreement on the Importation of Educational, Scientific, and Cultural Materials, *opened for signature* November 22, 1950, T.I.A.S. No. 6129, 17 U.S.T. 1835, 131 U.N.T.S. 25, provided that contracting states undertake not to apply customs duties or other charges on books, publications and documents or on educational, scientific and cultural materials. The materials contemplated by the latter grouping were listed in annexes B ("Works of Art and Collectors' Pieces of an Educational, Scientific or Cultural Character"), C ("Visual and Auditory Materials of an Educational, Scientific or Cultural Character"), D ("Scientific Instruments or Apparatus") and E ("Articles for the Blind"). According to U.S. Senate Report No. 564, 97th Cong., 2d Sess. 16–17 (1982), U.S.Code Cong. & Admin.News, 1982, 4078, 4093–4094, the Nairobi Protocol, which went into effect January 2, 1982, 1259 U.N.T.S. 2, broadened the scope of the Florence Agreement by embracing technologically-new articles and previously-uncovered works of art, films etc. That report issued in conjunction with the 1982 congressional enactment, *supra*, section 165 of which eliminated duties on articles for the blind or other handicapped persons by amending the Tariff Schedules of the United States ("TSUS") to provide:

Articles specially designed or adapted for the use or benefit of the blind or other physically or mentally handicapped persons:

| | Articles for the blind: | | |
|---|---|---|---|
| 870.50 | Books, music, and pamphlets, in raised print, used exclusively by or for them ............ | Free | Free |
| 870.55 | Braille tablets, cubarithms, and special apparatus, machines, presses, and types for their use or benefit exclusively ... | Free | Free |
| 870.60 | Other ...................... | Free | Free |

96 Stat. 2347. In addition, section 165 set forth the following new headnote:

(a) The term "physically or mentally handicapped persons" includes any person suffering from a permanent or chronic physical or mental impairment which substantially limits one or more major life activities, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

(b) These items do not cover—

(i) articles for acute or transient disability;

(ii) spectacles, dentures, and cosmetic articles for individuals not substantially disabled;

(iii) therapeutic and diagnostic articles; or

(iv) medicine or drugs.

96 Stat. 2348. Depending on the year, these provisions were placed in the Appendix to the TSUS at page 9–49 for 1985 and 1986, for example, or, as contemplated above, in TSUS Schedule 8, Part 7 in 1988 [1].

1. That year Congress enacted the Omnibus Trade and Competitiveness Act, Public Law No. 100–418, 102 Stat. 1107, section 1121 of which further provided for implementation of the Nairobi Protocol, among other things, by repealing the Educational, Scientific, and Cultural Materials Importation Act of 1982 but by including the same provisions of that earlier statute in Part 7 of TSUS Schedule 8, numbered as items 870.65, 870.66 and 870.67. *See* Pub.L. No. 100–418, § 1121(b) and (f), 102 Stat. 1138, 1141–42. Section 1121(f) followed the re-promulgation of the TSUS by the U.S. International Trade Commission after adoption of the 1982 act in making the "Other" item (870.67) equal, rather than subordinate, to the articles for the blind encompassed by items 870.65 and 870.66. *Compare* 102 Stat. 1142 *with* 96 Stat. 2347 *and* USITC Pub. 1317, p. 829–2 (2d Supp. April 8, 1983).

In accordance with section 1121 of the 1988 act, the President, by Proclamation 5978 of May 12, 1989, authorized formal ratification of the Nairobi Protocol, which became effective on or about May 30, 1989. *See* 54 Fed.Reg. 21,187 (May 17, 1989). *See also* Pub.L. No. 100–418, § 1121(j), which provided:

## II

During those particular years, namely, 1985, 1986 and 1988, the plaintiff imported the merchandise at issue herein. From Japan came cellulose acetate hollow fiber dialyzers and arteriovenous fistula cannulation sets, while arterial-venous blood tubing sets were imported from Spain. As presented at trial, these items connect to each other as well as to blood vessels in the human body, usually in an arm or leg, and an electric dialysis machine, which, when so connected, engage in extracorporeal hemodialysis as the

machine pumps a small amount of ... blood out of the body and through a dialyzer containing a synthetic semipermeable membrane. The machine continually moves the blood through the dialyzer, constantly filtering out wastes and excess fluid, and continually returns the cleansed blood to the patient through a second needle in the same blood vessel. The hemodialysis machine produces the dialysis solution that removes the waste products and excess water.

(1) The provisions of this section, and the repeal and amendments made by this section, shall apply with respect to articles entered, or withdrawn from warehouse, for consumption on or after the later of—

(A) October 1, 1988, or

(B) the date that is 15 days after the deposit of the United States ratification of the Nairobi Protocol.

(2) Notwithstanding section 514 of the Tariff Act of 1930 or any other provision of law, upon request filed with the appropriate customs officer on or before the date that is 180 days after the later of the dates described in subparagraphs (A) and (B) of paragraph (1), any entry, or withdrawal from warehouse, of any article—

(A) which was made on or after August 12, 1985 and before such later date, and

(B) with respect to which there would have been no duty if the provisions of this section, or any amendments made by this section, applied to such entry or withdrawal,

shall be liquidated or reliquidated as though such entry or withdrawal had been made on or after such later date.

102 Stat. 1143.

Dialyzer

Plaintiff's Exhibit 2.

Also imported from Spain were four-prong cycler sets with universal connectors for use in peritoneal dialysis. That approach entails use of the human body's peritoneal membrane, rather than the external, artificial dialyzer, as a filter. Connected to a dialysis machine, the cycler set conveys liquid dialysate through the abdominal cavity, where it collects waste filtered from the blood by the peritoneal membrane.

Either way, the imported goods were classified by the U.S. Customs Service under TSUS item 709.17 ("Electro-medical apparatus, and parts thereof: ... Other"), and duties ranging from 4.2 to 4.7 percent were assessed *ad valorem*, depending on the time of entry.

Travenol protested that classification and now appeals to this court from the Service's denial(s) of its protest(s).[2] The plaintiff takes the position that the merchandise was entitled to entry duty-free as articles specially designed or adapted for the use or benefit of the blind or other physically or mentally handicapped persons, as set forth

above. In support of this position, the plaintiff relies on the following stipulations, among others, as well as on evidence adduced at trial:

11. Hollow Fiber Dialyzers, AVF Sets, Miniprime Sets and CCPD Sets are specially designed to be used in artificial kidney dialysis for the benefit of individuals suffering from renal failure, *i.e.* the lack of kidney function.

12. End Stage Renal Failure is when kidney function has completely and permanently stopped.

\* \* \* \* \* \*

18. Dialysis does not treat the kidney.

19. Dialysis removes the impurities of the blood.

20. One factor involved in determining whether a particular individual with chronic kidney failure can resume working once he is on dialysis is the particular work involved.

\* \* \* \* \* \*

22. Dialysis does not restore kidney function of a person with End Stage Renal Failure.

2. Jurisdiction is pursuant to 28 U.S.C. § 1581(a).

23. Persons suffering from end-stage renal failure are physically or mentally handicapped, as defined by the headnote to TSUS item 960.15 and 870.67, depending upon the time of entry.[3]

## III

The statute governing a case such as this provides that the decision of Customs is presumed to be correct and the burden of proving otherwise rests upon the party challenging that decision. 28 U.S.C. § 2639(a). Moreover, the court finds that the goods at bar clearly are for an electro-medical apparatus. Nonetheless, the plaintiff ably presents argument in support of duty-free treatment, which has reduced defendant's post-trial position to the following point:

> ... [B]ut for the fact that the imported merchandise is therapeutic, defendant would agree that it should be classified under item 960.15, TSUS, which, if applicable, prevails over other provisions in schedules 1–8, pursuant to Headnote 1 of Part 4, Schedule 9 of the TSUS.[4]

## A

The parties have stipulated that persons with end-stage renal disease are handicapped within the meaning of the TSUS headnote quoted above, and testimony at trial established that the imported merchandise is used all but exclusively for that malady. On the issue of whether or not those goods are therapeutic, the plaintiff relies heavily on *Richards Medical Company v. United States*, 13 CIT 519, 720 F.Supp. 998 (1989), *aff'd*, 910 F.2d 828 (Fed. Cir.1990). Challenged in that case was Customs classification under TSUS item 709.27 of medical instruments for implantation of human hip prostheses. The plain-

tiff importer took the position that those instruments were not therapeutic and thus entitled to duty-free entry. The Court of International Trade agreed, upon a rationale that a

> distinct common feature of therapeutic medicine is its purpose of complete or partial elimination of the disease. It is, therefore, necessary to establish a healing and curative purpose of a particular medical procedure in order to qualify it as therapeutic.
>
> Notwithstanding the ideal goal of medicine to cure all diseases, not every medical procedure is therapeutic, or intended to heal or cure the disease. Unfortunately, there are permanent or chronic diseases affecting major life activities, which are not curable. The medical procedures which are designed to relieve the discomfort caused by the disease, rather than to cure it, are not therapeutic.

13 CIT at 521, 720 F.Supp. at 1000. The court held that, while implantation of a hip prosthesis alleviates the pain and discomfort associated with the underlying affliction, that operation does not cure it and thus is not therapeutic for the purposes of the TSUS. The court of appeals affirmed this decision, pointing out that "the word 'therapeutic' has many different meanings and is subject to both broad and narrow interpretations." 910 F.2d at 830.

That has proven true in this case. Witnesses called as experts in nephrology by both sides testified that dialysis is therapeutic.[5] And there is broad lexicographic support for the proposition that "therapeutic" encompasses treatment of an illness or disease. *E.g.*, The Random House College Dictionary 1362 (rev. ed. 1988) ("of or pertaining to the treating or curing of disease"); Taber's Cyclopedic Medical Dictio-

---

**3.** Prior to trial, the plaintiff moved to amend its complaint, in particular paragraphs 13 to 17 thereof, which referred to "renal failure", on the ground that "renal failure is a more generic term for lack of kidney function whereas end stage renal disease specifically describes the situation of total irreversible kidney failure." As indicated by the above stipulations, this action does in fact focus on such end-stage failure, in contrast with acute renal failure, which was described at trial as of temporary duration. As

the term end-stage implies, in the absence of dialysis or transplant of healthy organ(s), a person at that stage dies.

**4.** Defendant's Post–Trial Brief, p. 2 n. 4 (emphasis deleted).

**5.** *Compare*, for example, the trial transcript ("Tr.") at 109–12 (testimony of Dr. Henderson) *with id.* at 165–66 (testimony of Dr. Lundin).

nary T–19 (7th ed. 1957) ("1. Pert. to results obtained from treatment. 2. Having medicinal or healing properties. 3. A healing agent"); Blakiston's New Gould Medical Dictionary 1235 (2d ed. 1956) ("therapeutics: The branch of medical science dealing with the treatment of disease"); Funk & Wagnalls New Standard Dictionary of the English Language 2499 (1942) ("Having healing qualities; curative; alleviative"). The generally-accepted view of therapeutics is as that branch of medicine which relates to the management or control of an illness or disease.[6] As such, it encompasses treatment of symptoms. Indeed, "[u]ntil as late as the latter part of the 19th century, therapeutics was entirely empirical and largely directed toward the relief of symptoms." 17 The New Encyclopaedia Britannica 255 (15th ed. 1986).

While at the trial of this case there was also general agreement among the witnesses that kidney dialysis is life-sustaining, the court finds from the evidence adduced that that process is not curative. And curing or healing is the standard which the courts in *Richards Medical Company v. United States, supra,* have chosen to equate with the tariff meaning of therapeutic. In the light of that decision, this court cannot and therefore does not find that plaintiff's imported devices, which admittedly are elements, even important ones[7], in dialysis, are themselves therapeutic, either individually or connected together. While one can argue that a hip prosthesis does have a healing or curative purpose[8], it cannot be argued that the merchandise at bar is any more curative than the instruments in *Richards.*

### B

The defendant attempts to distinguish *Richards* by arguing (1) that the hip prosthesis was not life-sustaining whereas the evidence in this case shows that kidney dialysis is; (2) that that case was decided upon a stipulation of facts submitted in lieu of trial and that the courts therefore did not have the benefit of the kind of expert testimony herein; and (3) "accepting Travenol's application of the tariff terms 'therapeutic article' would leave the terms meaningless, as *no* imported merchandise could fit its definition". Defendant's Post–Trial Brief, p. 12 (emphasis in original).

Sometimes, in complying with the enjoinder of *Marbury v. Madison, supra,* a court must first consider why the law is what it appears to be. This is such an occasion. The starting point is the language of the statute itself. *Madison Galleries, Ltd. v. United States,* 870 F.2d 627, 629 (Fed.Cir. 1989), citing *Bethesda Hospital Ass'n v. Bowen,* 485 U.S. 399, 108 S.Ct. 1255, 99 L.Ed.2d 460 (1988), *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981), and *Watt v. Alaska,* 451 U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981). On its face, that language is to the effect that articles for acute or transient disability; spectacles,

6. According to 17 The New Encyclopaedia Britannica 242 (15th ed. 1986):

Therapeutics, as the treatment and care of a patient for the purpose of combatting disease or injury, is concerned with the total management of the patient, including the supervision of diet and fluid intake; the employment of symptomatic and supportive measures to relieve pain and ease discomfort; the administration of drugs, vaccines, and antitoxins; the surgical repair or removal of diseased parts; the supply of artificial or natural tissues and organs; the use of drugs or irradiation; the application of physical agents such as heat and remedial exercises; nursing care; psychiatric treatment; the provision of activity for the development of muscle strength and motor skills; and the application of human sympathy and understanding, as well as the deployment of social services to cope with the social consequences and hardships with which disease is so frequently associated.

7. The court notes in passing that perhaps the most important element of all is the hollow fiber placed in the dialyzer as the filtering membrane and that such "[c]ellulosic plastics materials imported for use in artificial kidney machines or apparatus by a hospital or by a patient pursuant to prescription of a physician" were entitled to duty-free entry per TSUS item 854.20.

8. On the other hand, both courts in *Richards* took note of the fact that Customs had permitted the prostheses themselves to enter duty-free under TSUS item 960.15, which signifies a threshold determination by the Service that they are not therapeutic within the meaning of that item's governing headnote.

dentures, and cosmetic articles for individuals not substantially disabled; therapeutic and diagnostic articles; or medicine or drugs are not entitled to entry into the United States duty-free, even if specially designed or adapted for the use or benefit of the blind or other physically or mentally handicapped persons. Hence, if the goal is and has been to benefit the blind or other physically or mentally handicapped persons, the TSUS did not favor matter most immediately and directly beneficial. Therapeutic and diagnostic articles and medicine and drugs, for example, have been dutiable, which arguably contradictory phenomenon causes this court to investigate the reason therefor.

As discussed above, the stated purpose of the 1982 and then 1988 acts was to give effect to the Nairobi Protocol to the Florence Agreement on the Importation of Educational, Scientific and Cultural Materials. Among other things, that protocol recognized that "technical progress has changed the ways and means of transmitting information and knowledge, which is the fundamental objective of th[e Florence] Agreement" and "the needs and concerns of the developing countries should be taken into consideration, with a view to giving them easier and less costly access to education, science, technology and culture". 1259 U.N.T.S. at 4. Given such considerations, the contracting states agreed to extend the lists of materials originally set forth in the annexes to the Florence Agreement.

The court has perused those extensions and has failed to discern the kind of merchandise imported by the kind of party plaintiff at bar.[9] Annex E, for example, covers "Articles for the blind and other handicapped persons" as follows:

(i) All articles specially designed for the educational, scientific or cultural advancement of the blind which are imported directly by institutions or organizations concerned with the education of, or assistance to, the blind, approved by the competent authorities of the importing country for the purpose of duty-free entry of these types of articles, including:

(a) Talking books (discs, cassets or other sound reproductions) and large-print books;

(b) Phonographs and cassette players, specially designed or adapted for the blind and other handicapped persons and required to play the talking books;

(c) Equipment for the reading of normal print by the blind and partially sighted, such as electronic reading machines, television-enlargers and optical aids;

(d) Equipment for the mechanical or computerized production of braille and recorded material, such as stereo-typing machines, electronic braille, transfer and pressing machines, braille computer terminals and displays;

(e) Braille paper, magnetic tapes and cassettes for the production of braille and talking books;

(f) Aids for improving the mobility of the blind, such as electronic orientation and obstacle detection appliances and white canes;

(g) Technical aids for the education, rehabilitation, vocational training and employment of the blind, such as braille watches, braille typewriters, teaching and learning aids, games and other instruments specifically adapted for the use of the blind.

(ii) All materials specially designed for the education, employment and social advancement of other physically or mentally handicapped persons, directly imported by institutions or organizations concerned with the education of, or assistance to, such persons, approved by the competent authorities of the importing country for the purpose of duty-free entry of these types of articles, provided that equivalent ob-

9. The Form 13 (Disclosure of Corporate Affiliations and Financial Interest) filed at the commencement of this case states that "Travenol Laboratories, Inc. is now known as Baxter Healthcare Corporation[, which] ... is a fully owned subsidiary of Baxter International Inc." According to that corporation's 1991 annual report, it had net sales of some nine billion dollars, many in the arena of this proceeding.

jects are not being manufactured in the importing country.

1259 U.N.T.S. at 11–12. Clearly, from the perspective of the international agreements, duty-free entry was not foreseen in a matter such as this.

Nonetheless, what controls is the implementing legislation adopted by Congress. And, if "the statutory language is unambiguous, in the absence of 'a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.'" *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981), quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). *See, e.g., Lynteq, Inc. v. United States*, 976 F.2d 693 (Fed.Cir.1992); *Sea–Land Service, Inc. v. United States*, 920 F.2d 922, 924 (Fed.Cir. 1990) (citing *Mansell v. Mansell*, 490 U.S. 581, 592, 109 S.Ct. 2023, 2030, 104 L.Ed.2d 675 (1989), and *LSI Computer Systems v. U.S. Int'l Trade Comm'n*, 832 F.2d 588, 590 (Fed.Cir.1987)); *E.M. Chemicals v. United States*, 920 F.2d 910, 913 (Fed.Cir. 1990), citing *Nippon Kogaku (USA), Inc. v. United States*, 673 F.2d 380, 382 (CCPA 1982), and *Ozen Sound Devices v. United States*, 620 F.2d 880, 882 (CCPA 1980).

The court does not consider either the 1982 or the 1988 statutory language to be ambiguous. Moreover, study of their domestic legislative histories has failed to discern clearly expressed congressional intent contrary to the position espoused by the plaintiff that its kind of merchandise is entitled to duty-free entry. In fact, in 1982 and again in 1988, the drafters in Congress apparently intended "more liberalized treatment" than contemplated by the Nairobi Protocol,

> which limits its obligations to imports of these articles by certain institutions. The committee concurred in the Administration's judgment, strongly supported by interested private sector groups, that the institutional limitation should not be applied as a matter of policy and administrative convenience.

S.Rep. No. 564, 97th Cong., 2d Sess. 20 (1982). In opting for more liberalized treatment, Congress included the following statutory authority to limit duty-free treatment otherwise accorded under the 1982 act:

> (a) AUTHORITY TO LIMIT.—
>
> (1) IN GENERAL.—In addition to any authority under section 201 of the Trade Act of 1974 ..., the President may proclaim changes in the Tariff Schedules of the United States ... to narrow the scope of, or place conditions upon, the duty-free treatment accorded under section 164, section 165, or section 167(b) ... with respect to any type of article the duty-free treatment of which—
>
>> (A) has significant adverse impact on a domestic industry (or portion thereof) manufacturing or producing a like or directly competitive article, and
>>
>> (B) is not provided for in the Florence Agreement or the Nairobi Protocol.
>
> (2) RATES WHICH ARE TO TAKE EFFECT IF DUTY–FREE TREATMENT ELIMINATED.—If the President eliminates any duty-free treatment under paragraph (1), the rate of duty thereafter applicable to any article which is—
>
>> (A) affected by such action, and
>>
>> (B) imported from any source,
>
> shall be the rate proclaimed by the President as the rate applicable to such article from such source (determined without regard to this subtitle).
>
> (b) RESTORATION OF TREATMENT.—If the President determines that any duty-free treatment which is no longer in effect because of action taken under subsection (a) could be restored in whole or in part without a resumption of significant adverse impact on a domestic industry or portion thereof, the President may proclaim changes to the Appendix to the Tariff Schedules ... to resume such duty-free treatment.
>
> (c) OPPORTUNITY TO PRESENT VIEWS.—Before taking an action authorized by subsection (a) or (b), the President shall afford an opportunity for interested Government agencies and pri-

vate persons to present their views concerning the proposed action.

Pub.L. No. 97–446, § 166, 96 Stat. 2348. Such authority to limit duty-free treatment was re-enacted in 1988. *See* Pub.L. No. 100–418, § 1121(g), 102 Stat. 1142.

## IV

The defendant does not show that the President exercised this authority in regard to plaintiff's imports. Considering this void in the light of the history and the text of the controlling domestic legislation, and of *Richards Medical Company v. United States, supra,* this court must conclude that each of plaintiff's devices imported for persons with end-stage renal disease was entitled to entry free of duty. Judgment will issue accordingly.