**GOODMAN MANUFACTURING, L.P., Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 94–1477.

United States Court of Appeals, Federal Circuit.

Oct. 24, 1995.

**506**

William M. Methenitis, Strasburger & Price, L.L.P., Dallas, Texas, argued for plaintiff-appellant. With him on the brief was Andrew G. Halpern, Dallas, Texas.

Joseph I. Liebman, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Department of Justice, New York City, argued for defendant-appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General, Washington, DC, David M. Cohen, Director, Washington, DC, and Carla Garcia–Benitez, New York City. Also on the brief was Karen P. Binder, Office of the Assistant, Chief Counsel, International Trade Litigation, U.S. Customs Service, New York City, of counsel.

Marshall V. Miller and Melissa Farley Sebree, Miller & Company, P.C., Kansas City, Missouri, were on the brief for Amicus Curi-

ae, National Association of Foreign–Trade Zones.

Lauren R. Howard and Mary T. Staley, Collier, Shannon, Rill & Scott, Washington, DC, were on the brief for Amicus Curiae, American Iron and Steel Institute.

Before ARCHER, Chief Judge, MAYER and RADER, Circuit Judges.

MAYER, Circuit Judge.

Goodman Manufacturing, L.P., appeals a June 30, 1994, judgment of the Court of International Trade, 855 F.Supp. 1301 (Ct. Int'l Trade 1994), denying its motion for summary judgment and granting the government's cross-motion for summary judgment. We reverse.

### Background

In 1934, Congress authorized the creation of a Foreign Trade Zone Board "to grant to public and private corporations the privilege of establishing, operating, and maintaining foreign-trade zones for the purpose of expediting and encouraging foreign commerce." S.Rep. No. 1107, 81st Cong., 2d Sess. 1–2 (1949), *reprinted in* 1950 United States Code Cong.Serv. 2533, 2533–34; *see also* 19 U.S.C. § 81b(a) (1994). A foreign-trade zone is "an isolated, fenced off, and policed area within or adjacent to a port of entry." S.Rep. No. 1107 at 2, 1950 United States Code Cong. Serv. at 2533. A foreign-trade zone allows foreign merchandise to be manipulated "with a minimum of customs control and without customs bond" until it is brought into United States customs territory, at which point it is "subject to all customs laws and regulations." *Id.*

The relevant facts were stipulated before the Court of International Trade. In April 1990, Goodman requested a letter ruling from the United States Customs Service on the allowance for recoverable and irrecoverable waste found in section 3 of the Foreign Trade Zones Act, 19 U.S.C. § 81c (1994). This allowance is calculated when determining the appropriate dutiable value of "privileged foreign merchandise"[1] entering United

---

1. Under 19 C.F.R. § 146.41(a) (1995), foreign merchandise admitted to a foreign-trade zone

may be designated "privileged" at any time before it is manipulated or manufactured, upon

States customs territory as part of a finished product manufactured in a foreign-trade zone ("zone"). In July 1991, Customs ruled that the allowance is calculated by reducing the dutiable value of the foreign merchandise used in the manufacture of the goods entering United States customs territory by an amount equal to the transaction value of any recoverable waste produced. *See* Priv. Ltr.Rul. HQ 544602 (July 15, 1991). It ruled that this deduction of the transaction value of the recoverable waste is "[t]he only adjustment that Customs can make" to the dutiable value of the privileged foreign merchandise.

On May 12, 1992, Goodman admitted three cores of Korean cold rolled steel sheets into a foreign-trade subzone [2] in Houston, Texas, as privileged foreign merchandise, at a total cost of $4,848.24 (28,109 pounds of steel at $.17248/pound), exclusive of shipping and insurance costs. It used all of this steel to make 874 furnaces, which were entered into United States customs territory on May 15, 1992. The manufacturing process produced 2,652 pounds of recoverable scrap steel, which Goodman sold for $81.68.[3]

In accordance with its July 1991 letter ruling, Customs subtracted the transaction value of the scrap steel ($81.68) from the transaction value of the privileged foreign steel ($4,848.24) to arrive at the dutiable value of the privileged foreign steel ($4,767.00). That is to say, Customs subtracted the actual sales price received for the recoverable steel waste from the full price paid for all privileged foreign steel admitted to the zone.

Goodman filed a protest of this valuation, which was denied. It initiated this action in the Court of International Trade to contest the denial. Goodman argued that subtract-

ing the quantity of steel scrap at the value per pound of the privileged foreign steel (2,652 lbs. × $0.17248/lb = $457.42) from the transaction value of the privileged foreign steel ($4,848.24) would result in the correct dutiable value of the privileged foreign steel ($4,390.82). In other words, Goodman claimed that it need only pay duty on the physical quantity of steel that actually entered United States customs territory in the manufactured items. *See* 855 F.Supp. at 1302.

In approving Customs's calculation of the allowance, the Court of International Trade characterized the allowance as a "deduction" for the recoverable waste "generated as a result of the processing in the zone," and noted that Customs classifies and appraises the recovered waste based on its character and condition at the time of entry into customs territory. *Id.* at 1305. The court rejected Goodman's interpretation of section 81c, explaining that it would create problems where the quantity of merchandise changes as a result of physical or chemical changes caused by the manufacturing process in the zone. *See id.* at 1306. The court further held that Customs's interpretation was entitled to a presumption of correctness and that Goodman had not overcome the presumption. Thus, the Court of International Trade granted summary judgment to the government.

*Discussion*

I.

The issue is whether the Court of International Trade correctly held that the allowance for recoverable waste provided for in section 81c equals the value of the waste.

application to and approval by the district director of Customs with jurisdiction over the foreign-trade zone. Privileged foreign merchandise retains its original identity even if it later goes through a manufacturing process. *See id.* § 146.41(e). For example, in this case, privileged foreign steel was made into furnaces in the zone. When the furnaces were entered into United States customs territory, it was the steel, not the finished furnaces, that was considered entered and subject to duty.

**2.** A foreign-trade subzone "has all the characteristics of a zone except that it is an area separate from an existing zone" and "can only be created when a company cannot be accommodated within the zone." *Conoco, Inc. v. United States Foreign–Trade Zones Bd.*, 18 F.3d 1581, 1582 n. 3 (Fed.Cir.1994).

**3.** The scrap was classified as nonprivileged foreign merchandise and was entered and appraised at the transaction value of $81.68. There is no dispute over the dutiable value of the scrap or the duties paid on it.

We review statutory interpretation by the Court of International Trade *de novo. Guess? Inc. v. United States,* 944 F.2d 855, 857 (Fed.Cir.1991). A decision granting summary judgment is also reviewed *de novo.* See *id.*

The Court of International Trade made the general statement that Customs's "decisions enjoy a presumption of correctness" and, more specifically, stated that Goodman "failed to overcome the presumption of correctness that attaches to the valuation methodology adopted by Customs." 855 F.Supp. at 1303, 1306. These statements reflect a commingling of two concepts: (1) deference to an agency's reasonable interpretation of the statute it administers; and (2) the statutory presumption, found in 28 U.S.C. § 2639, that Customs's decisions have a proper factual basis unless the opposing party proves otherwise. *See* 28 U.S.C. § 2639(a)(1) (1988) ("[I]n any civil action commenced in the Court of International Trade under section 515, 516, or 516A of the Tariff Act of 1930, the decision of the Secretary of the Treasury, the administering authority, or the International Trade Commission is presumed to be correct. The burden of proving otherwise shall rest upon the party challenging such decision."). Because there was no factual dispute between the parties, the presumption of correctness is not relevant. Instead, we must determine whether Customs's decision is based on a permissible construction of the trade statutes. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

Both parties filed cross-motions for summary judgment, and both agreed that only an issue of law separated them. Thus, summary judgment was appropriate, and the only question is whether the Court of International Trade erred in accepting Customs's interpretation of the statutory allowance for waste.

## II.

Our interpretation of the statute begins with the language employed by Congress. *Mallard v. United States Dist. Ct. for the S. Dist. of Iowa,* 490 U.S. 296, 300–01, 109 S.Ct.

1814, 1817–18, 104 L.Ed.2d 318 (1989); *Watt v. Alaska,* 451 U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981). The treatment and appraisal of foreign merchandise entered into United States customs territory from a foreign-trade zone is provided for in 19 U.S.C. § 81c, the provision at issue, which reads as follows:

> Foreign and domestic merchandise of every description, except such as is prohibited by law, may, without being subject to the customs laws of the United States, ... be brought into a zone and may be stored, sold, exhibited, broken up, repacked, assembled, distributed, sorted, graded, cleaned, mixed with foreign or domestic merchandise, or otherwise manipulated, or be manufactured ..., and be exported, destroyed, or sent into customs territory of the United States therefrom ...; but when foreign merchandise is so sent from a zone into customs territory of the United States it shall be subject to the laws and regulations of the United States affecting the imported merchandise: *Provided,* That *whenever the privilege shall be requested ..., the appropriate customs officer shall take under supervision any lot or part of a lot of foreign merchandise in a zone, cause it to be appraised and taxes determined and duties liquidated thereon.* Merchandise so taken under supervision ... may be sent into customs territory upon the payment of such liquidated duties and determined taxes thereon. *If merchandise so taken under supervision has been manipulated or manufactured, such duties and taxes shall be payable on the quantity of such foreign merchandise used in the manipulation or manufacture of the entered article. Allowance shall be made for recoverable and irrecoverable waste; and if recoverable waste is sent into customs territory, it shall be dutiable and taxable in its condition and quantity and at its weight at the time of entry.*

19 U.S.C. § 81c (emphasis added).

Under the corresponding Customs regulations, the dutiable value of privileged foreign merchandise contained in articles transferred from a zone to United States customs territory is based on the price paid for the mer-

chandise in the transaction that caused it to be entered into the zone, and the dutiable value of any nonprivileged waste produced is based on the transaction that caused it to enter customs territory. 19 C.F.R. § 146.65(b)(2). Thus, 19 C.F.R. § 146.65(b)(2) provides that the dutiable value of privileged foreign steel is "the price actually paid or payable for the merchandise in the transaction that caused the merchandise to be admitted into the [foreign-trade] zone," less international shipment and insurance costs and United States inland freight costs. Under the same provision, the dutiable value of steel waste is determined by "the price actually paid or payable to the zone seller in the transaction that caused the recoverable waste or scrap to be transferred from the zone."

### A.

Goodman argues that the plain language of section 81c requires that the waste allowance be measured in terms of the quantity of waste, with the waste valued at the same price as the non-waste privileged foreign steel. It reasons that the phrase "allowance shall be made for recoverable and irrecoverable waste" modifies the mandate of the immediately preceding sentence that "duties and taxes shall be payable on the *quantity* of such foreign merchandise used in manipulation or manufacture of the entered article." Taking this language to signify a quantity-based approach, Goodman would deduct the quantity of steel scrap from the original amount of dutiable steel before calculating the dutiable value of the privileged foreign steel. The company contends that this is the only approach that produces rational results consistent with the requirements of transaction value, the mandatory method of valuation in this case.

Although Goodman imported 28,109 pounds of steel, under this approach, its allowance of 2,652 pounds of scrap would result in duties being assessed on only 25,457 pounds of steel at the rate applicable to the privileged merchandise. This calculation is as follows:

| Transaction value of 28,-109 pounds of privileged foreign steel | minus | 2,652 pounds steel waste at the value per pound of privileged foreign steel | equals | dutiable value of privileged foreign steel |
|---|---|---|---|---|
| 28,109 lbs × $.17248/lb. | − | 2,652 lbs × $.17248/lb. | = | 25,457 lbs. × $.17248/lb. |
| $4,848.24 | | $457.42 | | $4,390.82 |

At an *ad valorem* duty rate of 5.1%, this results in a duty of $223.93.

We do not accept Goodman's proposed methodology, because it oversimplifies the language of section 81c. It focuses on the word "quantity" in the statute to the exclusion of the phrase "used in the manufacturing process." Although Goodman argues that the statutory focus on "quantity" means that the allowance must be a reduction in the amount of steel to be dutied, the statute is not entirely clear on that point. The phrase "[a]llowance shall be made" simply does not indicate any particular method.

Goodman also does not consider the full implication of the last clause of section 81c, which provides that "if recoverable waste is sent into customs territory, it shall be dutiable and taxable in its *condition and quantity* and at its weight at the time of entry." 19 U.S.C. § 81c (emphasis added). By focusing solely on quantity, Goodman's approach values the recoverable waste at the full value per pound of the privileged foreign steel for purposes of the allowance. The result is that the steel waste is overvalued. In fact, under this approach it is as though the steel waste never existed, which belies the view that "Congress signalled its intention to make the imposition of immediate duties dependent on the operations that occur in a foreign trade zone when it listed the activities that could be performed on merchandise brought into a zone." *Nissan Motor Mfg. Corp., U.S.A. v.*

*United States,* 884 F.2d 1375, 1377 (Fed.Cir. 1989).

## B.

Customs's determination, approved by the Court of International Trade, is also incorrect. Customs subtracted the transaction value of the recoverable waste produced during the manufacturing process and entered into United States customs territory from the value of the privileged foreign steel brought into the zone. The figure used for the transaction value of the recoverable waste was the actual sales price received for the waste when it entered United States customs territory. This calculation was as follows:

| Transaction value of 28,109 pounds of privileged foreign steel | minus | transaction value of the steel waste | equals | dutiable value of privileged foreign steel |
|---|---|---|---|---|
| $4,848.24 | − | $81.68 | = | $4,767.00 |

At the applicable *ad valorem* rate of duty of 5.1 percent, the duty is $243.12.

This explanation improperly conflates the waste allowance and the provision for calculating the dutiable value of any recoverable waste that is entered into customs territory. Customs set the allowance for steel scrap at its market value. Yet this figure is actually the *dutiable* value of the steel scrap. Making this the allowance results in a gross under-allowance, because the allowance, however calculated, should reflect the difference in value between the non-scrap and the scrap steel.

Moreover, a strictly value-based approach cannot have been intended when Congress referred specifically to both recoverable and irrecoverable waste with no clarifying language. Congress is presumed not to have used superfluous language. *See United States v. J.E. Mamiye & Sons, Inc.,* 665 F.2d 336, 339 (CCPA 1981) (citing *United States v. Avdel Corp.,* 546 F.2d 901 (CCPA 1977)). Yet the reference to irrecoverable waste would serve no purpose if Congress's objective had been simply to subtract the transaction value of any waste produced.

## C.

■■■ We agree with the Court of International Trade that the statute does not explicitly prescribe a method for calculating the allowance for waste. Thus, in determining the meaning of this ambiguous statute, a reasonable interpretation by the agency that implements it is entitled to deference. *Shalala v. Guernsey Memorial Hosp.,* —— U.S. ——, ——, 115 S.Ct. 1232, 1236, 131 L.Ed.2d 106 (1995); *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82. However, we disagree with the Court of International Trade that Customs's approach "produces a substantive effect that is compatible with the rest of the law." *United Savings Ass'n v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988). Statutory interpretation "is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because ... only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *Id.*

Although legislative history may at times shed light on statutory language, in this case the history of the waste allowance provision is virtually nonexistent. The allowance made its appearance in 1950, when the statute was amended, *inter alia,* to allow manufacturing and other manipulation of merchandise within a zone. Pub.L. No. 81–566, § 1, 64 Stat. 246–47 (1950) (codified as amended at 19 U.S.C. § 81c). The waste allowance was not a focal point of the hearings on the 1950 amendment, however. One of the only explicit references to it came during the hearing before the House Committee on Ways and Means:

In every phase of industrial operation, waste must always be taken into account, whether or not this waste is consumed in the manufacturing process or whether recoverable; if recovered waste is imported, it will be dutiable and taxable in its condi-

tion and quantity, and at its weight at the time the waste is taken into account.

*Hearing Before the House Comm. on Ways and Means on H.R. 6159 and H.R. 6160,* 80th Cong., 2d Sess. 37 (1948) (statement of Mr. L.I. Harvey, Executive General Agent, Bd. of Commissioners, Port of New Orleans). The second clause of this statement found its way into the amended statute virtually unchanged; the first clause, with its admonition that waste "be taken into account," does little to shed light on the statutory language. At any rate, the speaker was testifying before the committee and thus the statement is entitled to little weight, as are the only other statements arguably relevant to the waste allowance. *See Hearing Before the House Comm. on Ways and Means on H.R. 6159 and H.R. 6160,* 80th Cong., 2d Sess. 48 ("A duty, of course, will not be assessed on the materials which go into articles that are subsequently exported or destroyed, or on the materials which are consumed in the manufacturing process.") (statement of Mr. Sterling St. John, Jr., Assistant to the President, New York Foreign–Trade Zones Operators, Inc.); *id.* at 55 ("Merchandise of low standard may be brought into a zone and graded up to meet the exacting requirements of the American consuming public, with all waste eliminated before the payment of duty.") (excerpt from an article in the January 1948 issue of *Pacific Northwest Industry,* by Rep. Homer R. Jones).

Although the legislative history of the waste allowance is not very illuminating, the statutory context and the corresponding regulations do provide some guidance. Section 81c states that recoverable waste "shall be dutiable and taxable in its condition and quantity and at its weight at the time of entry" into customs territory. Under the applicable regulation, the dutiable value of the steel waste is determined by "the price actually paid or payable to the zone seller in the transaction that caused the recoverable waste or scrap to be transferred from the zone." 19 C.F.R. § 146.65(b)(2). These two mandates, along with the statutorily prescribed method of calculating the pre-allowance dutiable value of the privileged foreign steel, demonstrate how to calculate the maximum amount on which a zone manufacturer could be assessed duties. Any method for calculating the allowance must result in the amount of duty on both privileged steel and nonprivileged steel waste prescribed by the statute and regulations.

Stated in these terms, it is clear that Customs's approach results in an under-allowance, and Goodman's results in an over-allowance. Customs's approach results in an under-allowance because it is the same as assessing duties on $375.74 worth of scrap steel, even though the scrap is only worth $81.68. Goodman's approach, in contrast, would treat the scrap for purposes of the allowance as though it were valueless, even though it was sold for $81.68. Put another way, Customs treats the scrap steel as though it were privileged steel for purposes of the allowance, whereas Goodman treats all of the waste as though it were irrecoverable.

■ Thus, to reconcile the statutory and regulatory language, the allowance must be the *difference* between the market value of the privileged steel initially brought into the zone and the market value of the steel scrap. This is the only approach consistent with section 81c and 19 C.F.R. § 146.65(b)(2). The calculation would be as follows:

| Transaction value of 28,109 pounds of privileged foreign steel | minus | difference between market value of privileged foreign steel and steel scrap | equals | dutiable value of privileged foreign steel |
|---|---|---|---|---|
| $4,848.24 | − | ($457.42 − $81.68) $375.74 | = | $4,472.50 |

This is essentially equivalent to separating the steel into categories of non-scrap and scrap before contemplating duties. Using the 5.1 percent duty rate results in a duty of $228.10.[4]

Although the government and *amicus curiae* American Iron and Steel Institute argue that any approach other than Customs's methodology would allow importers to take unfair advantage of foreign-trade zones to the detriment of domestic producers, "the Foreign Trade Zones Act clearly contemplates that trade zone users may take advantage of differing rates in tariff schedules and thereby, depending on what form a product might take when imported from the zone into the United States customs territory, save on customs duties." *ARMCO Steel Corp. v. Stans*, 431 F.2d 779, 784–85 (2d Cir.1970). As *amicus* National Association of Foreign-Trade Zones points out, foreign-trade zones provide many advantages to manufacturers: duties need not be paid on merchandise that is damaged or otherwise lacking commercial value; and privileged foreign merchandise is dutied at the rate applicable when it enters the zone, thus avoiding payment of duty on the value added within the zone. That the waste allowance may enure to the benefit of importers does not justify construing it so that it has little or no value.

### Conclusion

Accordingly, the judgment of the Court of International Trade is reversed.

### COSTS

Each party shall bear its own costs.

*REVERSED.*

---

**4.** Because Goodman's manufacturing process did not produce any irrecoverable waste, the issue of how to calculate the allowance for it is not before us. We note, however, that it is no more difficult to deal with irrecoverable waste than recoverable waste using this approach; because irrecoverable waste by definition has no value, it would be accorded an allowance of full value.