**ANVAL NYBY POWDER AB, Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**Slip Op. 96–80.**
**Court No. 95–02–00183.**

United States Court of
International Trade.

May 21, 1996.

Sonnenberg & Anderson, New York City (Philip Yale Simons, Jerry P. Wiskin, New York City, Michelle D. Mancias, Chicago, IL), for Plaintiff.

Frank W. Hunger, Assistant Attorney General, Washington, DC; Joseph I. Liebman, Attorney in Charge, International Trade Field Office; Amy Rubin, Civil Division, Dept. of Justice, Commercial Litigation Branch; Beth C. Brotman, New York City and Myron P. Barlow, Office of Assistant Chief Counsel, U.S. Customs Service, Miami, FL, of counsel, for Defendant.

## OPINION

POGUE, Judge:

Plaintiff, Anval Nyby Powder AB, invokes this Court's jurisdiction under 28 U.S.C. § 1581(a) (1994).[1] The action involves the proper classification of cobalt alloy powders within heading 8105 of the Harmonized Tariff Schedule of the United States ("HTSUS").[2] Customs' classification is before this Court for de novo review pursuant to 28 U.S.C.

---

1. The action is limited to those entries covered by Protest Numbers 1001–94–105372 and 1001–94–106289. Plaintiff as the importer of record and consignee of the merchandise timely filed these protests which Customs denied. On February 17, 1995, Plaintiff timely commenced .the instant action, having previously paid all liquidated duties for the entries covered by Protest Numbers 1001–94–105372 and 1001–94–106289.

2. The provisions under consideration are as follows:

| 8105 | Cobalt mattes and other intermediate products of cobalt metallurgy; cobalt and articles thereof, including waste and scrap: |
| --- | --- |
| 8105.10 | Cobalt mattes and other intermediate products of cobalt metallurgy; unwrought cobalt; waste and scrap; powders; |
| | Unwrought cobalt: |
| 8105.10.30 | Alloys . . . . . . . . . . . . . . . . 5.5% ad valorem |
| 8105.10.60 | Other . . . . . . . . . . . . . . . . . : . . . . . . . . . . . . Free |
| 8105.10.90 | Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Free |

§ 2640(a) (1994) on the summary judgment motions of the plaintiff and the defendant. Upon liquidation the United States Customs Service ("Customs") classified the cobalt alloy powders as "Unwrought cobalt: Alloys" under subheading 8105.10.30, HTSUS, and assessed a 5.5% ad valorem duty. Plaintiff claims that the cobalt alloy powders are properly classified duty free under subheading 8105.10.90, HTSUS, as "Other." Neither party disputes that the cobalt alloy powders are properly classified under subheading 8105.10. Both parties also agree that the merchandise is a powder[3] and an alloy[4] within the meaning of the HTSUS. Subheading 8105.10 covers cobalt mattes and other intermediate products of cobalt metallurgy; unwrought cobalt; waste and scrap; and powders. Subheading 8105.10 is further subdivided into subheadings 8105.10.30 and 8105.10.60 which are provisions for unwrought cobalt (alloys and other, respectively) and subheading 8105.10.90, a residual or basket provision which covers the balance of merchandise within the scope of the 8105.10 subheading. The issue before the court is whether the cobalt alloy powders should be classified under subheading 8105.10.30 as "Unwrought cobalt" or under subheading 8105.10.90 as "Other."

## UNDISPUTED FACTS

The chemical composition of the cobalt alloy powders in issue varies depending on their use; in plaintiff's merchandise, the metallic elements normally alloyed with cobalt are chromium, tungsten, iron and nickel. Cobalt is the predominant base metal contained in the cobalt alloy powders in issue, with concentrations ranging between 31.2% and 62.6% by weight.

Plaintiff's cobalt alloy powders are produced by an inert gas atomization process. Predetermined amounts of cobalt metal and the alloying metals make a composition which is placed in an induction furnace and melted. After melting, samples are taken and the chemical composition of the melt is determined by x-ray spectroscopy and other means to ascertain whether it is of the desired composition. If the composition of the melt does not meet specifications, cobalt or other metals are added to the melt until the desired composition is achieved.

When the melt has the desired composition, the molten alloy is poured into a tundish which has holes in its base. The molten metal flows through the base and is passed through a nozzle which can withstand high temperatures. As the alloy composition passes through the nozzle, it encounters a stream of inert gas of either nitrogen or argon, which causes the metal to form liquid droplets. The droplets solidify into spherical forms as they fall inside a collection tank. The spherically-shaped powders collect at the bottom of the collection tank where they cool to room temperature, and are further bathed in the inert gas to prevent any chemical reaction with oxygen in the air.

Plaintiff's cobalt alloy powders are specially manufactured to produce a spherical shape with small sizes and uniform distribution. A screening table comprised of two screens of different mesh sizes is used. The two screens are parallel to each other and separated by several inches. For cobalt alloy powders, the top screen normally has a mesh size of 250 microns and the bottom screen has a mesh opening of 53 microns.[5] Once collected from the furnace, the powder is placed on the top screen—powder particles greater than 250 microns remain on the screen and particles smaller than 250 microns fall onto the 53 micron screen. Normally, the particles greater than 250 microns and less than 53 microns are not sold commercially, but are used as a raw material in manufacturing other metal powders.

---

3. The cobalt alloy powders are powders for tariff purposes: the maximum size of any powder is significantly less than 1mm and more than 90% of the powders in issue would pass through a sieve with an aperture of 1mm. Note 6(b) to Section XV, HTSUS.

4. The powders in issue are cobalt alloys for tariff purposes: the content of the respective base metal (cobalt) is, by weight, less than 99%, but not less than any other metallic element. Additional Note 1 to Chapter 81, HTSUS.

5. A micron is 1/1000 of a millimeter.

The fraction which has particles between 53 and 250 microns is passed through the system again to further remove larger and smaller particles which were not separated on the initial pass. After the second pass, a sample of the particles which are retained by the 53 micron screen are then passed through a series of screens which satisfy the American Society of Testing Materials ("ASTM") E11 specification to produce the actual size and distribution which is placed on the test certificate.

When the imported merchandise is used in an intended application, the resulting product does not possess the dimensional features of the cobalt alloy powder. The imported merchandise is only used for two applications: plasma arc welding [6] and thermal spraying.[7] (Tingskog Aff. ¶ 8 *filed with* Plaintiff's Reply to Defendant's Supplemental Brief Submitted Pursuant to the Court's March 22, 1996). In these applications, the powder must be melted for it to form as solid mass which conforms to the shape of the weld or the article being coated. (*Id.*) Neither the weld nor the coating is in a powder form. (*Id.*) The powders are often used in coating automotive and other valves.

## STANDARD OF REVIEW

Rule 56 of this court permits summary judgment when "there is no genuine issue as to any material fact...." USCIT R. 56(d); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265

(1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390–91 (Fed.Cir. 1987); *Glaverbel Société Anonyme v. Northlake Marketing & Supply, Inc.*, 45 F.3d 1550 (Fed.Cir.1995).

In considering whether material facts are in dispute, the evidence must be considered in a light most favorable to the nonmoving party, drawing all reasonable inferences in its favor, as well as all doubts over factual issues. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Anderson*, 477 U.S. at 253, 106 S.Ct. at 2512; *Mingus*, 812 F.2d at 1390–91. Nevertheless, "when a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." USCIT R. 56(f). Once it is clear there are no material facts in dispute, a case is proper for summary adjudication. This is such a case.

Customs' classification is before this court for de novo review pursuant to 28 U.S.C. § 2640(a) (1994). The court is to "make its determinations upon the basis of the record made before the court." *Id.* The court's review may go beyond the issues considered in Custom's administrative determination. Specifically, the court may act on grounds which have not been considered by the agency below. 28 U.S.C. § 2638 (1994). In addition, the legislative mandate specifically directs the court to determine the correct classification for the merchandise involved. 28 U.S.C. § 2643(b)

---

**6.** Plasma arc welding is defined as "welding metal in a gas stream heated by a tungsten arc to temperatures approaching 60,000°F (33,315°C)." McGraw-Hill, Dictionary of Scientific and Technical Terms 1441 (4th ed. 1989). "An arc welding process that produces coalescence of metals by heating them with a constricted arc between an electrode and the workpiece (transferred arc) or the electrode and the constricting nozzle (nontransferred arc). Shielding is obtained from hot, ionized gas issuing from an orifice surrounding the electrode and may be supplemented by an auxiliary source of shielding gas, which may be an inert gas or a mixture of gases. Pressure may or may not be used, and filler metal may or may not be supplied." Metals Handbook: Desk Edition 1–29 (Howard E. Boyer, Timothy L. Gall, eds. ASM 1985).

**7.** Thermal Spraying is defined as a "[g]roup of processes in which finely divided metallic or nonmetallic materials are deposited in a molten or semimolten condition to form a coating." B.J. Moniz, Mettalurgy 527 (2d. ed. American Technical Publishers, Inc. 1994). Plasma Spraying is a "thermal spraying process in which the coating material is melted with heat from a plasma torch that generates a nontransferred arc ...; moltencoating material is propelled against the basis metal by the hot, ionized gas issuing from the torch." Metals Handbook: Desk Edition 1–29 (Howard E. Boyer, Timothy L. Gall, eds. ASM 1985).

(1994). To establish a classification for the goods at issue, the court must consider "whether the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878, *reh'g denied*, 739 F.2d 628 (1984). These statutory provisions require the court to decide the correct classification of cobalt alloy powders by determining the proper meaning of the applicable tariff subheadings.

 "The ultimate issue as to whether particular imported merchandise has been classified under an appropriate tariff provision … entails a two step process: (1) ascertaining the proper meaning of specific terms in the tariff provision; and (2) determining whether the merchandise at issue comes within the description of such terms as properly construed." *Sports Graphics, Inc. v. United States*, 24 F.3d 1390, 1391 (1994). The first step is a question of law and the second step is a question of fact. *E.M. Chem. v. United States*, 920 F.2d 910, 912 (1990).[8]

### DISCUSSION

The principal issue in this case concerns the interpretation of subsection 8105.10 of the HTSUS. In addition, the defendant has placed in issue the standard of review the court should apply in resolving classification cases: specifically, whether *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), applies to routine classification cases involving disputed interpretations of the HTSUS.

### I

 *Chevron* sets forth a two-step analysis for court review of agency interpretations of statutes: Using the traditional tools of statutory construction, the court ascertains whether congressional intent on the disputed issue is clear, and, if clear, the court applies the statute in the manner Congress intended, regardless of the agency's position.[9] If the statute is ambiguous, the court, rather than interpreting the statute anew and rendering its own interpretation, must defer to an administrative agency's "permissible construction of the statute."[10]

The United States Court of International Trade (CIT) has sparingly cited *Chevron*'s two-step analysis in classification cases.[11]

8. To determine the proper meaning of tariff terms in the statute, the terms are "construed in accordance with their common and popular meaning, in the absence of contrary legislative intent." *E.M. Chem. v. United States*, 920 F.2d 910, 913 (Fed.Cir.1990). Courts may rely upon their own understanding of the term used, and may consult dictionaries, scientific authorities, and other reliable sources of information. *Nippon Kogaku (USA), Inc. v. United States*, 673 F.2d 380, 382 (1982) (citations omitted); *Brookside Veneers, Ltd. v. United States*, 847 F.2d 786, 789 (Fed.Cir.1988), *cert. denied*, 488 U.S. 943, 109 S.Ct. 369, 102 L.Ed.2d 358, *see also Texaco Marine Services, Inc. v. United States*, 44 F.3d 1539 (Fed.Cir.1994). "[W]hile courts have relied primarily upon lexicons and other similar authorities, courts may and do look to the testimony of record to determine the common meaning of a tariff term, a question of law. Such testimony may properly be considered simply as advisory and as aiding the memory and understanding of the court, and it is not binding and may be accepted or rejected as appears proper." *Marubeni America Corp. v. United States*, 915 F.Supp. 413, 416–17 (1996).

9. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984) ("First,

always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

10. *Id.* at 843, 104 S.Ct. at 2782 ("If, …, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.").

11. *See, e.g., Mitsui Foods, Inc. v. United States*, 12 CIT 276, 280, 688 F.Supp. 605 (1988). *Mitsui* does not stand for the proposition that Customs' interpretations of the tariff schedules are entitled to deference. The court in *Mitsui* deferred not to Customs, but to another agency: the National Marine Fisheries Service. The legal issue concerned whether American Samoa was properly excluded by the NMFS in its determination of "United States Pack." The court did not defer to

Instead, the court has expressly rejected *Chevron*'s application to classification cases. *Semperit Indus. Prod., Inc. v. United States*, 855 F.Supp. 1292, 1299–1300 (1994). The *Semperit* court reasoned that the CIT's statutory mandate to find de novo [12] the correct result in a classification case [13] was logically incompatible with *Chevron* deference.[14] *Semperit*, 855 F.Supp. at 1300.[15]

Additional reasons support rejection of *Chevron*'s two-step analysis in routine classification cases. The CIT has exclusive jurisdiction over classification cases.[16] The CIT, together with its predecessors, the Customs Court and the Board of General Appraisers, have interpreted the tariff schedules of the United States since 1890.[17] To change the court's longstanding practice of interpreting the tariff schedules and the operation of 28 U.S.C. §§ 2638, 2640(a), 2643(b) would require congressional action.

On appeal from a classification case in which the CIT applied *Chevron*, *Crystal Clear Indus. v. United States*, 843 F.Supp. 721, 725–26 (1994), the Court of Appeals for the Federal Circuit noted that, notwithstanding its affirmance, the appellate decision "did not extend to the suggestion that a routine

Customs' interpretation of the statute, but applied *Chevron* to defer to the Fisheries Service definition "United States Pack." *Mitsui*, 12 CIT at 282, 688 F.Supp. 605.

**12.** 28 U.S.C. § 2640(a)(1) (1994). *See also* H.R.Rep. No. 1235, 96th Cong., 2d Sess. 59, *reprinted in* 1980 U.S.C.C.A.N. 3729 at 3770 ("Subsection (a)(1) provides for a trial de novo in the Court of International Trade in a civil action commenced pursuant to section 515 of the Tariff Act of 1930."). *Chevron* has been broadly applied to cases involving statutory interpretation of agency administered statutes even though section 706 of the Administrative Procedure Act provides that "to the extent necessary . . . the reviewing court shall decide all relevant questions of law." 5 U.S.C. § 706 (1994). Classification cases, however, are not reviewed under the APA; Congress instead specifically designated these cases for de novo review by the Court of International Trade. *Compare* 28 U.S.C. § 2640(a) *with* § 2640(e).

**13.** 28 U.S.C. § 2643 (1994); *Jarvis Clark*, 733 F.2d 873, 878, *reh'g denied*, 739 F.2d 628 (1984) ("The statute is more logically interpreted as mandating that the court reach a correct decision in every case. . . . [W]hether the court remands, conducts its own hearing, or simply examines the law and the tariff schedules on its own initiative, it is required to reach a correct result.").

**14.** "Such deference is logically incompatible with the Court's role in customs classification cases because the standard in these cases requires the Court to reject any interpretation, *however reasonable,* that the Court determines to be incorrect." *Semperit*, 855 F.Supp. at 1300 (emphasis in original).

**15.** Moreover, in classification and valuation actions the statute specifically provides that the court may entertain new grounds for its decision that were not placed in issue before the United States Customs Service. 28 U.S.C. § 2638 (1994). This provision is incompatible with the

notion that special deference should be given to the agency's construction of the tariff schedules; otherwise, the court's review would have been limited to those legal grounds raised before the agency. The court is aware that *Chevron* deference applies to "an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782. The legislative history to the Omnibus Trade and Competitiveness Act of 1988 does state that the United States Customs Service is responsible for interpreting and applying the Harmonized Tariff System and that Customs takes a lead role in the Customs Cooperation Counsel Harmonized System Committee, particularly with respect to issues regarding United States interpretation and application of the HTS to particular products. H.R.Conf.Rep. No. 576, 100th Cong., 2d Sess. at 1988 U.S.C.C.A.N. 1547, 1582. This legislative history, however, cannot limit the clear language of 28 U.S.C. §§ 2638, 2640(a)(1), and 2643(b). True enough, if no action is commenced in the CIT, Customs' classification of imported merchandise is final, 19 U.S.C. § 1514(b), and that finality insures that Customs' interpretations of the tariff schedules are not trivial. Under the jurisdiction of the CIT and by operation of 28 U.S.C. §§ 2638 (new grounds), 2640(a)(1) (de novo review), and 2643(b) (correct result), the court must review Customs' legal interpretation of the tariff schedules on an equal footing with other competing interpretations.

**16.** 28 U.S.C. § 1581(a), (b). *See also* 19 U.S.C. § 1514(a), 1516(d).

**17.** *See* Sections 13 & 14 of the Customs Administrative Act, ch. 407, 26 Stat. 136–137 (1890). The Board of General Appraisers was created by Congress in 1890 "to exercise, under the general direction of the Secretary of the Treasury, such other supervision over *appraisements and classifications,* for duty, of imported merchandise as may be needful *to secure lawful and uniform appraisements and classifications* at the several ports." Section 12, Customs Administrative Act, ch. 407, 26 Stat. 136 (1890).

classification dispute is entitled to special deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837[, 104 S.Ct. 2778, 81 L.Ed.2d 694] (1984)." *Crystal Clear Indus. v. United States,* 44 F.3d 1001, 1002 n. * (1995).

Recently, the Court of Appeals for the Federal Circuit cited *Chevron*'s two-step analysis in a valuation case. *Goodman Mfg., Inc. v. United States,* 69 F.3d 505 (Fed.Cir. 1995). The court held that the statutory presumption of correctness that applies to Customs' decisions[18] is only applicable to Customs' factual determinations. *Id.* at 508. In place of the statutory presumption of correctness, the court discussed *Chevron* to afford a measure of deference to Customs' legal interpretation of the tariff schedules. *Id.* Although the court determined that the statute was ambiguous, the court did not defer to Customs' interpretation. *Id.* at 510. The court held that Customs' construction was "incorrect" and rendered its own interpretation of the statute. *Id.* at 510, 511–512.

The statutory mandate to find the correct result under 28 U.S.C. § 2643(b) is applicable to both classification and valuation actions.[19] The final outcome in *Goodman* is consistent with the statutory obligation to find the correct result. The end result in *Goodman* that

Customs' interpretation of ambiguous statutory and regulatory provisions was *incorrect*—and that the court's interpretation was "the only approach" consistent with the statute and regulation—is consistent with the statutory mandate to find the correct result in classification and valuation cases. *Goodman* demonstrates that the court's statutory obligation to find the correct result limits the court's ability to give special *Chevron* deference to permissible constructions rendered by the United States Customs Service in the valuation or classification context.

The operation of 28 U.S.C. §§ 2638, 2640(a), 2643(b); the result in *Goodman;* the sheer weight of past practice and precedent in customs litigation spanning over a century; and the Federal Circuit's statement in *Crystal Clear,* 44 F.3d 1001, 1002 n. * (1995), lead the Court to conclude that special *Chevron* deference does not apply in the routine classification case.[20]

## II

■ The classification question before the Court is whether the cobalt alloy powders should be classified under subheading 8105.10.30 as "Unwrought cobalt" or under subheading 8105.10.90 as "Other." Rule 1 of the General Rules of Interpretation of the

---

18. *See* 28 U.S.C. § 2639(a)(1) (1994).

19. *See* H.R.Rep. No. 1235, 96th Cong., 2d Sess. 60, *reprinted in* 1980 U.S.C.C.A.N. 3729 at 3772) ("Subsection (b) has particular impact on civil actions brought pursuant to section 515 or 516 of the Tariff Act of 1930. Under existing law, for example, in a civil action commenced under the court's jurisdiction to entertain cases involving the *classification or valuation* of merchandise, if the plaintiff succeeds in demonstrating that the original decision of the Customs Service was incorrect but is unable to establish *the correct classification or valuation,* the court dismisses the civil action. In effect, the court holds in favor of the United States even though the plaintiff has demonstrated that the challenged decision of the Customs Service was erroneous. Subsection (b) would permit the court in this situation to remand the matter to the Customs Service to make the correct decision or to schedule a retrial or rehearing so that the parties may introduce additional evidence.") (emphasis added).

20. The defendant cites *Marubeni America Corp. v. United States,* 915 F.Supp. 413 (1996) and *Lotto*

*U.S.A., Inc. v. United States,* 12 CIT 187, 1988 WL 18982 (1988) to support its contention that *Chevron* deference applies to Customs' interpretations of the tariff schedules. Neither case supports this proposition. The court in *Marubeni* held that the *importer's interpretation* of a tariff term was not entitled to deference, *Marubeni,* 915 F.Supp. at 418, and stated, "Hence, in light of the foregoing rationale in *Semperit* based on *Jarvis Clark,* holding that a deferential standard is precluded in classification cases, a fortiori a deferential standard in favor of the importer cannot exist." *Id.*

The defendant's reliance on *Lotto* excerpts the following sentence: "Plaintiff's interpretation of the TSUS provision has nothing to recommend it over the approach taken by the government; in such a situation the government's interpretation must prevail." The court in *Lotto,* however, had already concluded that the government's "reasonable and easily understood rule applying the statute seems the best approach." *Lotto,* 12 CIT at 188. This conclusion follows the statutory mandate to find the "correct result." Accordingly, the *Lotto* court's conclusion does not support the defendant's interpretation of that decision.

Harmonized Tariff Schedule provides that "classification shall be determined according to the terms of the headings and any relative section or chapter notes." HTSUS, Gen.R.Interpr. 1.

Heading 8105.10 contains four types of articles: cobalt mattes and other intermediate products of cobalt metallurgy; unwrought cobalt; waste and scrap; and powders. Congress created only two further subheadings, one for "Unwrought cobalt" and the "Other" or basket provision; there is, therefore, no specific heading or subheading for cobalt powders.[21] Consequently, cobalt powders must either be classified as "Unwrought cobalt" or as "Other."

Plaintiff claims that cobalt alloy powder is classifiable within subheading 8105.10.90, "Other." Subheading 8105.10 lists both "unwrought cobalt" and "powders," and provides inferior subheadings 8105.10.30 for "Unwrought cobalt" and 8105.10.90 for "Other." Plaintiff argues that the drafters intended powder to be included in the "Other" or basket provision, because there is no inferior subheading for "Powder" like there is for "Unwrought cobalt."

Defendant claims that cobalt alloy powder is a "manufactured primary form" similar to the other forms listed in the tariff schedule definition of unwrought and is therefore properly classifiable within the unwrought subheading, 8105.10.30, HTSUS.

Powders are defined in the HTSUS as "Products of which 90 percent or more by weight pass through a sieve having a mesh aperture of 1mm." Note 6(b) to Section XV, HTSUS. Unwrought is defined in the HTSUS as "... metal, whether or not refined, in the form of ingots, blocks, lumps, billets, cakes, slabs, pigs, cathodes, anodes, briquettes, cubes, sticks, grains, sponge, pellets, flattened pellets, rounds, rondelles, shot and *similar manufactured primary forms* ..." Additional U.S. Note 2 to Section XV, HTSUS (emphasis added). The definition of unwrought does not specifically mention powders.[22]

Whether the unwrought provision encompasses powders turns on the meaning of "manufactured primary forms." In interpreting the meaning of "manufactured primary forms," the Court must ascertain the common characteristic or unifying criterion of ingots, blocks, lumps, billets, etc. that makes them "manufactured primary forms." The Court can then determine whether the cobalt alloy powder in issue has that characteristic or meets that criterion.

Defendant claims that the forms listed in Additional U.S. Note 2 undergo further processing before they appear in an eventual finished product. Plaintiff claims that the forms listed are characterized by *their specific shape* and cannot include powder, which is defined *by its size*. Plaintiff further argues that because a "primary metal" comes directly from ores or ore concentrates, a manufactured primary form is a manufactured form of metal in which the input materials come directly from ores or ore concentrates.[23]

▮ Plaintiff's arguments are unpersuasive. Plaintiff's proffered definitions of the forms listed in Additional U.S. Note 2 to

---

**21.** *Cf.* "Copper powders and flakes" 7406, HTSUS; "nickel powders and flakes" 7504, HTSUS; "aluminum powders and flakes" 7603, HTSUS; "lead powders and flakes" 7804.20, HTSUS; "zinc powders" 7903.90.30, HTSUS; "molybdenum powders" 8102.10, HTSUS.

**22.** Briquettes—one of the listed forms in Additional U.S. Note 2 to Section XV, HTSUS—are made of compressed powders. (Wu Decl. ¶ 9 *filed as Exhibit B in* Defendant's Brief in Response to Order Dated March 22, 1996); (Shedd Decl. ¶ 5 *filed as Exhibit C in* Defendant's Brief in Response to Order Dated March 22, 1996). *See also* (Plaintiff's Response to Defendant's [Supplemental] Statement of Uncontested Facts ¶ 18).

**23.** As noted above, plaintiff also argues that because there is an inferior subheading for "Unwrought cobalt" and not one for "Powder," the Court must infer that Congress intended powder to be included in the "Other" or basket provision. This argument ignores the additional language included in subheading 8105.10, HTSUS. This subheading also includes "waste and scrap." Accordingly, the "Other" subheading has a specific function even if it does not include "powders," i.e., it provides a classification for waste and scrap. Moreover, powder, the use of which does not require a secondary operation to transform it into an object which has particular size, strength, shape and other manufactured features, could be classified as "Other" because it would not be similar to the manufactured primary forms identified.

Section XV, HTSUS, indicate that their shapes can vary significantly. Blocks do not have a specific shape; nor do lumps, grains, or sponge. They are all irregularly shaped. Shape, therefore, is an inadequate unifying criterion for the enumerated forms. Something is not labeled a "manufactured primary form" because of its shape.[24] It is true that the enumerated items take on their particular form through some type of shaping and/or sizing process, but they are not collectively categorized as "unwrought" because of that shaping or sizing process.

Plaintiff correctly states that a primary metal is one obtained directly from the ore, or ore concentrate, *see authorities cited in* ¶ 25 of Plaintiff's Supplemental Statement of Material Facts Not in Dispute,[25] but the tariff term in issue is "manufactured primary form," not "primary metal." Additional U.S. Note 2 to Section XV, HTSUS, lists the *form* of certain metal products and not the *material* from which they are composed. Of the possible definitions of the word "primary" as used in Additional U.S. Note 2, the Court concludes that "preliminary to a later stage in a continuing process," THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1438 (3d ed. 1992), best communicates legislative intent.[26] The definition of unwrought contained in Additional U.S. Note 2 connotes

a stage in a manufacturing process which eventually results in a different ultimate product. The Court concludes that the phrase "manufactured primary forms" refers to forms that have undergone some processing but must undergo further processing before they appear in an eventual final product. This definition provides a unifying characteristic for the otherwise disparate enumerated forms. (German Declaration ¶ 12, *filed with* Defendant's Reply to Plaintiff's Supplemental Brief);[27] (Wu Declaration ¶ 11, *filed with* Defendant's Response to Order Dated March 22, 1996).[28]

Applying this definition to the cobalt alloy powders in issue, the Court must conclude that they are indeed similar to the unwrought manufactured primary forms listed in Additional U.S. Note 2. This is true because—like the other manufactured primary forms listed in Note 2—the powder undergoes further processing, in this case plasma arc welding or thermal spraying, before it appears in the final product, e.g., an automotive valve. There is no evidence in the record to indicate that the powders are themselves a final product. Rather, the powders are later processed to coat other products, becoming a part of a finished good. Apart from that finished good, they have no apparent utility.

24. The Court notes that Additional U.S. Note 2 to Section XV, HTSUS, does not set forth size limitations in its definition of unwrought. "Shot" can in fact range in size from well above 1 mm to well below 1mm, and "grains" are frequently much smaller than what is considered the upper limit for powder particles. (German Supp.Decl. ¶¶ 7, 9 *filed with* Defendant's Reply to Plaintiff's Supplemental Brief).

25. Plaintiff cites METALS HANDBOOK: DESK EDITION 1–30 (Howard E. Boyer, Timothy L. Gall, eds. ASM 1985); MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS 1527 (5th ed. 1994); DICTIONARY OF SCIENCE AND TECHNOLOGY 933 (1971).

26. "Where a tariff term has various definitions and meaning and has broad and narrow interpretations, the court must determine which definition best invokes the legislative intent." *Marubeni America Corp. v. United States*, 905 F.Supp. 1101, 1105 (1995) (citing *Richards Medical Co. v. United States*, 910 F.2d 828 (Fed.Cir.1990)).

27. Dr. Randall M. German, the Brush Chair Professor in Materials with the Engineering Science

and Mechanics Department at the Pennsylvania State University and author of the standard university text POWDER METALLURGY SCIENCE states that "unwrought" as defined in the tariff schedules "encompasses forms of metal which are not specific to any application until they have been further processed by common metalworking technologies." (German Decl. ¶ 12, *filed with* Defendant's Reply to Plaintiff's Supplemental Brief).

28. Dr. James B.C. Wu, vice president of technology for Stoody Deloro Stellite, chairman of the American Welding Society's subcommittee on specifications of surfacing powders, and author of several articles on wear resistant coatings and cobalt alloys states, "The common characteristic of the enumerated forms and the subject powders is that, in order to be used in actual applications, a secondary operation is generally required. These secondary operations may include melting, spraying, or pressing followed by sintering to create the (secondary) forms used in the actual applications." (Wu Decl. ¶ 11, *filed with* Defendant's Response to Order Dated March 22, 1996).

Accordingly, Customs properly classified the cobalt alloy powders in question as "unwrought" under subheading 8105.10.30, HTSUS.

### CONCLUSION

Plaintiff's motion for summary judgment is denied, and defendant's cross-motion for summary judgment is granted. Judgment shall be entered accordingly.

### *JUDGMENT*

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision,

IT IS HEREBY ORDERED: Plaintiff's motion for summary judgment is denied, and defendant's cross-motion for summary judgment is granted. Accordingly, this action is hereby dismissed.