AURUM JEWELERS, INC., PLAINTIFF v. UNITED STATES, DEFENDANT

Court No. 94–05–00266

(Dated April 21, 1997)

Leonard M. Fertman Professional Corporation (Leonard M. Fertman & Donald A. Rezak) for plaintiff.

Frank W. Hunger, Assistant Attorney General, Joseph I. Liebman, Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (Bruce N. Stratvert), Chi S. Choy, Office of Assistant Chief Counsel, International Trade Litigation, United States Customs Service, of counsel, for defendant.

MEMORANDUM OPINION

DiCARLO, Senior Judge: Plaintiff, Aurum Jewelers, Inc., challenges the United States Customs Service's classification of imported gold jewelry under subheading 7113.19.50 of the Harmonized Tariff Schedule of the United States (HTSUS), dutiable at a general Most Favored Nation (MFN) rate of 6.5% ad valorem. HTSUS § XIV, ch. 71, subheading 7113.19.50 (1993). Plaintiff claims the jewelry should be allowed duty-free entry under the column 1 "special" rate for subheading 7113.19.50, pursuant to the Generalized System of Preferences ("GSP"), 19 U.S.C. §§ 2461–66 (1988). Id. at subheading A7113.19.50 (1993); see 19 C.F.R. § 10.172 (1993). Plaintiff filed a protest against the liquidation of the merchandise. Upon denial of the protest, plaintiff instituted this action and a trial was held pursuant to 28 U.S.C. § 2640(a)(1) (1994). Jurisdiction is proper under 28 U.S.C. § 1581(a) (1994).

BACKGROUND

This dispute concerns the proper classification of imported gold jewelry, consisting of rings, chains, necklaces and earrings. Plaintiff contends

the merchandise at issue is Malaysian in origin, and was hand carried from Malaysia to the United States via an intermediate, overnight stop in Singapore. Plaintiff claims the jewelry was not manipulated in any way in Singapore prior to shipment to the United States, and that no operations took place with respect to the jewelry which would deprive the merchandise of its otherwise permissible GSP duty-free preference.

Customs denied duty-free entry for the jewelry, because Customs inspectors found a number of the imported items had hallmarks of either unknown origin or hallmarks registered to a Singapore company, and found the description of the merchandise on the GSP documentation as well as the shipping invoice were inconsistent with the imported shipment of jewelry. Customs therefore withheld GSP treatment and applied the general MFN rate of 6.5%.

## DISCUSSION

This case centers on whether Customs properly withheld GSP treatment for a shipment of jewelry classified as dutiable at 6.5% *ad valorem*. The court makes its determinations "upon the basis of the record made before the court[.]" 28 U.S.C. § 2640(a) (1994). In order for merchandise to qualify for GSP treatment, it must come from a beneficiary developing country, it must be on the list of GSP-eligible articles, the sum of the cost or value of its materials plus the cost of its processing must be at least 35% of the item's appraised value, and it must be imported directly from the beneficiary developing country into the United States. 19 U.S.C. § 2463(a-b) (1988); *see* 19 C.F.R. §§ 10.171–10.178 (1993) (Customs' regulations pertaining to GSP established pursuant to 19 U.S.C. § 2463(a-b)). Plaintiff bears the burden of proving that Customs' determination is incorrect. 28 U.S.C. § 2639(a)(1) (1994).

In this case, no dispute exists as to specific tariff terms in either subheading 7113.19.50 or subheading A7113.19.50, HTSUS. Rather, in determining whether the items qualify for the GSP classification, the dispute turns on whether the jewelry at issue came from Malaysia, a beneficiary developing country at the time of importation, *(see* Act of Aug. 10, 1993, subch. D § 13802(b), Pub. L. No. 103–66, 107 Stat. 667 (extending duty-free treatment until Sept. 30, 1994,) and whether the merchandise underwent any GSP-prohibited operations prior to entry into the United States or was imported directly into the United States. In addressing these issues, plaintiff must overcome the statutory presumption of correctness that operates in favor of Customs' factual determinations. 28 U.S.C. § 2639(a)(1) (1994) (describing presumption); *see Goodman Mfg., L.P. v. United States,* 69 F.3d 505, 508 (Fed. Cir. 1995) (limiting presumption to factual determinations); *see also IKO Indus., Ltd. v. United States,* 105 F.3d 624, 626 (Fed. Cir. 1997) (citing *Goodman).* Plaintiff argues that the merchandise is the product of Malaysia, and that it was imported directly into the United States.

Plaintiff's first witness, Mrs. Tan Hong Yee, is managing partner of Golden Goldsmith Jewelers of Singapore. Golden is the parent company

of both Aurum Jewelers and Goldjew SDN BHD, a manufacturing subsidiary located in Malaysia. Mrs. Yee testified that the Goldjew factory is under her supervision and control, and that she ordered Goldjew to manufacture the jewelry at issue for sale in the United States. She further noted that neither Goldjew nor Aurum had hallmarks of their own. She stated that any hallmarks imprinted on jewelry imported by Aurum were created because they were manufactured from used machines. Those machines, imported into Malaysia from Singapore, contained dies having the hallmark or imprimatur of other companies. Mrs. Yee claimed she did not eliminate the hallmarks from the dies, because, to her knowledge, the use of the purchased hallmarks did not violate any Malaysian laws pertaining to the manufacture of jewelry. She explained that eliminating the hallmarks would thus have been an unnecessary business expense.

Mr. Heang Hock Yeo, president of Aurum, testified that Mrs. Yee requested that he pick up the jewelry at issue for export to the United States. He stated that he witnessed over several days in Malaysia the manufacture of the jewelry at issue, and that he personally selected the items for sale in the U.S. He further explained that he hand-carried the jewelry via a commercial air carrier first to Singapore, where it was placed in a Golden company safe during an overnight transit stopover. Mr. Yeo testified that he and Mrs. Yee removed the jewelry from the safe the following day, and that he took it aboard the plane for the second leg of the journey to the United States. Plaintiff argues that, "[a]t no time, with the exception of the time the merchandise was in the company safe in Singapore was the jewelry at issue manipulated in any way or out of the custody and control of Mr. Yeo." (Pl.'s Br. at 8.)

Plaintiff further relies upon the documentation which accompanied the entry of merchandise to support its claim that the jewelry came from Malaysia and was imported directly into the United States. Plaintiff notes the GSP Certificate of Origin Form A and merchandise invoice both identify a total quantity of 40,000 grams of gold jewelry shipped for Aurum Jewelers. *Id.* at 14. Aurum further states that the Form A shows an air route shipment from Penang, Malaysia to Singapore to Los Angeles, additional evidence that the merchandise was destined for the U.S. when it left Malaysia.

The court does not agree that plaintiff's evidence makes it "abundantly clear" that the imported merchandise originated in Malaysia and that the merchandise was imported directly from Malaysia into the United States. *Id.* at 6. Although the testimony of plaintiff's witnesses, if accepted, could explain how non-Malaysian hallmarks might have been imprinted on the jewelry, neither witness was able to demonstrate that the jewelry with the hallmarks were actually manufactured in Malaysia by such Goldjew machines with other companies' hallmarks still in their dies. Mrs. Yee was in Singapore when the jewelry was actually manufactured. Mr. Yeo did not witness the manufacture of all of the jewelry, and testified that he was originally not aware of (1) any hallmarks on the im-

ported jewelry, jewelry which he personally selected, or (2) the existence of hallmarks in the dies of some of the Goldjew machines.

The inconsistencies in the documentation accompanying the imported goods are also highly problematic. Although plaintiff asserts the description of the merchandise on the GSP Certificate of Origin Form A and product invoice, both of which Goldjew completed, are an identical match, both forms mischaracterize the items actually imported. The Form A and product invoice describe a shipment for Aurum of 40 total kilograms of gold jewelry. (Pl.'s Br. Exh. A (GSP Certificate of Origin Form A; Goldjew SDN BHD original Invoice)). The invoice furthermore values the shipment of goods at $435,045. *Id.* While the actual shipment had a total weight of 39.983 kgs, the total value was $416,747. *Id.* (Goldjew SDN BHD Corrected Invoice). The actual values and total values as initially indicated in the documents vary by 17 grams and $18,298. Defendant concedes this variance is not great, (Def.'s Br. at 5,) and does not base its arguments on this factor alone. The court, however, when viewing the shipment in a disaggregated manner, finds there is a substantial variance between the actual and initially submitted values.

After Customs' inspectors discovered this variance, Goldjew issued a corrected invoice for Customs' review describing the actual value and type of goods imported into the United States. That revised invoice description is compared to the original invoice description below:

| Original invoice breakdown | Revised invoice breakdown |
| --- | --- |
| 13.7 kgs of 24K jewelry | 2.194 kgs of 24K jewelry |
| 20.0 kgs of 22K jewelry | 27.709 kgs of 22K jewelry |
| 6.3 kgs of 18K jewelry | 10.080 kgs of 18K jewelry |

*(Cf.* Pl.'s Br. Exh. A (original invoice); *id.* (corrected invoice)). There is a discrepancy of 11.506 kgs of 24K jewelry, 7.709 kgs of 22K jewelry, and 3.78 kgs of 18K jewelry between the actual merchandise shipped and the initial documentation—*i.e.,* the initial invoice and the Certificate of Origin Form A—describing the merchandise to be shipped.

Plaintiff acknowledges that the Form A is "intended to certify that the imported merchandise shipped under [the original invoice] was a product of Malaysia and was eligible for duty free treatment pursuant to the Generalized System of Preferences." (Pl.'s Br. at 14.) However, as the court has found, the description of jewelry provided on the Form A and the original invoice do not accurately represent the actual merchandise imported. In her testimony, plaintiff's witness Mrs. Yee discounted the significance of this substantial variance in gram weights for different jewelry articles of various carats. She claimed that any differences arose from the fact that, because the Form A had to be completed several days in advance of Mr. Yeo's departure with the merchandise and prior to the actual packaging of the ultimate shipment, the figures included on the Form A were only "estimates" of the actual shipment and could have varied slightly from the actual composition of the final shipment. How-

ever, the differences were not slight, but were in fact substantial. Moreover, the description and breakdown of the merchandise provided on the Form A is identical to the breakdown provided on the Malaysian Certificate of Origin form certified to be correct only *one* day prior to the date of export. Thus, the jewelry documented as having been exported from Malaysia did not match the goods that ultimately entered the United States.

Such significant discrepancies raise serious questions as to whether the jewelry was imported directly from Malaysia into the United States, as required by 19 U.S.C. § 2463(b) (1988) and 19 C.F.R. § 10.175 (1993) to qualify for GSP treatment. GSP rates "apply to those products which are properly classified under a provision for which a special rate is indicated and for which all of the legal requirements for eligibility for such program or programs have been met." General Notes 3(a)(iii), 3(c)(i), HTSUS (1993 Supp. I); *see* HTSUS Preface at 1 (noting the legal text of the HTSUS includes General Notes). It is not at all clear that the merchandise was directly imported from a beneficiary country to the United States. When imported items are of questionable origin, "the article[s] shall not be considered to have been produced in the beneficiary developing country." 19 C.F.R. § 10.177(b) (1993). Taking into account the documentary inconsistencies, as well as the credibility of the witnesses, including the plaintiff witnesses' interest in the outcome of this case, the court finds that (1) plaintiff has not presented sufficient evidence to overcome Customs' presumption of correctness and (2) the jewelry was properly denied GSP treatment.

### CONCLUSION

Based on the statutory language and the applicable case law, plaintiff has not presented sufficient evidence to override Customs' presumption of correctness. The court finds Customs' classification under subheading 7113.19.50, HTSUS, to be correct. Judgment will be entered accordingly.